Ralph REMUS, individually and on behalf of a class of persons similarly situated, Plaintiff,

v.

AMOCO OIL COMPANY, Defendant.

Civ. A. No. 83–C–204.

United States District Court, E.D. Wisconsin.

June 24, 1985.

James S. Grodin, Grodin & Grodin, and George Kersten, Kersten & McKinnon, Milwaukee, Wis., for plaintiff.

Stuart Parsons, Quarles & Brady, Milwaukee, Wis., Richard C. Godfrey, Frank Cicero, Kirkland & Ellis, Chicago, Ill., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

This case concerns Amoco Oil Company's "discount for cash" (DFC) marketing program, which it introduced in Wisconsin in 1982. The plaintiff, Ralph Remus, is an Amoco dealer in LaCrosse, Wisconsin. Remus, and the class of similarly situated Amoco dealers throughout Wisconsin which he seeks to represent, challenges the aspect of Amoco's DFC program which calls for the collection of a credit card fee from the dealers. Remus has alleged that Amoco's initiation of the DFC program violates the Wisconsin Fair Dealership Law,

Ch. 135, Wis.Stats., and the credit card contract between the parties. Remus has further alleged that Amoco misrepresented the nature and profitability of DFC. The case is before me on Amoco's motion for summary judgment.

Ralph Remus first became an Amoco service station dealer in 1968. In 1977, Remus incorporated his station as Ralph's Standard, Inc. The basic documents creating the dealership relationship are the lease and supply contracts, but many dealers—including Remus—also enter into other contracts with Amoco covering such things as equipment and credit card acceptance.

Prior to the inception of the "discount for cash" program, Amoco customers paid the same price for their gas whether they paid cash or paid with their Amoco credit card. The costs of administering the Amoco credit card system were built into the price of the gas across the board. DFC was designed to eliminate the subsidization of the credit card system by cash customers who did not use it. Amoco hoped DFC would attract more cash customers, a growing segment of the gasoline market.

Under DFC, dealers who accepted credit cards would be charged a fee—initially 4%, later reduced to 3%—on the credit card receivables Amoco purchased from them. To offset the fee, dealers would receive a discount off the regular dealer gasoline buying price for all gas, whether resold on a cash or credit basis. (The discount was initially 2.8%, later reduced to 2.1%.) Dealers would then in turn offer their cash-paying customers a discount. In this way, the cost of the Amoco credit card system was separated out from the cost of the gasoline.

Remus' deposition testimony indicates that he first learned about DFC in April of 1982 from his Amoco territory and field sales managers. At that time, DFC had been in place in the Milwaukee area as a test market and Amoco expected to expand it to the rest of Wisconsin during the summer. Remus testified at his deposition that he was interested in DFC at that time, and on May 20, 1982, at an Amoco trade show in Milwaukee, Remus told the district man-

ager that he wanted to participate in the program. At the trade show Remus discussed the risks and benefits of DFC with dealers who had been using it. He received mixed reports, depending on the location and clientele nature of the dealership.

On June 8, 1982, Remus attended a meeting among Amoco representatives and other state Amoco dealers about DFC and other marketing programs. On July 8, 1982, Remus attended another meeting to arrange for the introduction of DFC in the LaCrosse area. Remus agreed to participate and, on July 20, started the program.

Remus states that DFC has alienated his credit card customers, causing a gradual loss of business. The program did not, as he had expected it to, result in a substantial narrowing of the gap between his wholesale cost for gas and that of "the independents"—competitors not affiliated with any specific brand. He and other Wisconsin Amoco dealers organized a protest against DFC, the tactics of which included withholding the credit card fee. In response Amoco threatened to cancel the dealers' credit card contracts. Remus dropped his protest in favor of filing this lawsuit.

*The WFDL Claim*

The Wisconsin Fair Dealership Law provides:

*Section 135.03. Cancellation and Alteration of Dealerships.*

No grantor, directly or through any officer, agent or employee, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

*Section 135.04. Notice of Termination or Change in Dealership.*

Except as provided in this section, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, non-renewal or substantial change in competitive circumstances. The notice shall state all the reasons for

termination, cancellation, non-renewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency....

Amoco argues that the WFDL does not apply here for the following reasons: DFC affects only the credit card contract and that contract is not a "dealership agreement" within the meaning of the WFDL; DFC does not constitute "a change in competitive circumstances"; if DFC is "a change in competitive circumstances" then it is not a "substantial change" within the meaning of the WFDL; and, the WFDL does not apply because Remus agreed to participate in DFC.

The first three of these arguments are overly technical, and I decline to accept them. Viewed reasonably, the introduction of DFC has, without a doubt, substantially changed the competitive circumstances of Remus' dealership. Furthermore, as Amoco concedes, the WFDL regulates the relationship between a grantor and a dealer with respect to the dealership. To exclude Remus from its coverage merely because his relationship with Amoco is embodied in several separate documents would be contrary to the spirit of the law.

However, the argument about the voluntariness of Remus' participation in DFC is persuasive. Remus admits that he agreed to "try" the program, but says he never specifically agreed to the credit card fee. However, Remus acknowledges being fully aware of the fee aspect of DFC at the time he consented to it. Remus cannot accept the part of the program he likes—the discount—and reject the part he doesn't like. At any rate, Remus has continued to participate in the program; DFC has apparently become a permanent part of Amoco's credit card system.

That fact brings me to the reason why I believe the WFDL is not applicable here. The language of § 135.03 restricts a grantor from unilaterally terminating or changing the competitive circumstances of a dealership without "good cause." Section 135.-04 requires the grantor to give the dealer notice of the changes or termination; the notice must include a statement of the reasons for the action and give the dealer a sixty-day period to cure the deficiency that prompted the grantor's action. The definition of the "good cause" necessary under the statute is:

135.02(4) "Good cause" means:

(a) failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or

(b) bad faith by the dealer in carrying out the terms of the dealership.

The language of the WFDL assumes a grantor decision based on some sort of dealer shortcoming. The statute does not address a grantor decision based on business reasons unrelated to the dealer—such as a decision to change the way a credit card program is operated systemwide. This raises a troubling question: Are grantors prohibited from occasionally changing the way they do business because the WFDL defines "good cause" only with respect to the behavior of the dealers?

I believe the answer to that question is no. Common sense suggests that when a company has determined that an aspect of its business should be changed in order to stay competitive, it has good cause to make the change provided that it does so in a non-discriminatory manner. If business exigencies totally unrelated to the dealer require a change in policy, and the company implements the change among all its dealerships, the protections of the WFDL are unnecessary. The underlying purposes of the WFDL are, among other things:

Section 135.025(2)(a). To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis ...

It would hardly be fair, and I don't believe the Wisconsin legislature intended, to so circumscribe a grantor's business judgment that the grantor risks WFDL liability even when it makes a non-discriminatory change in policy based on factors unrelated to the dealer.

During the pendency of this motion the Court of Appeals for the Seventh Circuit issued its decision in *Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.,* 761 F.2d 345 (7th Cir.1985), affirming Judge Barbara Crabb's holding that a grantor's decision to terminate all of its dealerships nationwide in favor of company-owned stores violated the WFDL. In that case, Walgreen's decided to eliminate all its independently-owned dealerships because they were, in Walgreen's view, not making enough money.

Just after Judge Crabb's decision in *Kealey,* I issued an opinion in *St. Joseph Equipment v. Massey-Ferguson, Inc.,* 546 F.Supp. 1245 (W.D.Wis.1982), holding that Massey-Ferguson's complete withdrawal from the North American construction machinery market did not violate the WFDL. In that decision, I noted a distinction between that case and *Kealey,* on which the Seventh Circuit commented:

> The good cause definition in Section 135.-02 ... does not permit blanket terminations of dealerships such as those affected by Walgreen's. Under Section 135.03, "the burden of proving good cause is on the grantor" with respect to the termination of every dealership. Even though defendant relies upon *St. Joseph Equipment v. Massey-Ferguson, Inc.,* 546 F.Supp. 1245 (W.D.Wis.1982), as being contrary to plaintiffs, the author of that opinion stated that he agreed with the district court's result in the present case based on its facts (at page 1248). Since Walgreen intends to maintain and increase its own stores in the same marketing area in competition with plaintiffs who helped to build up the Walgreen reputation and image there, it was not unfair for the Wisconsin legislature to prohibit a manufacturer and supplier such as defendant from terminating all

its dealers because they produced an inadequate rate of return.
*Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.,* 761 F.2d 345, 350 (7th Cir.1985).

Applying the *Kealey* analysis to this case produces a result which, I believe, could not have been intended by the legislature. It makes sense that a grantor should not be off the hook simply because its action was even-handed. As Judge Crabb observed, this would permit a grantor to do anything as long as it was done to everyone. *Kealey Pharmacy & Home Care Service, Inc. v. Walgreen Co.,* 539 F.Supp. 1357, 1365 (W.D.Wis.1982). But I believe the analysis in this case must go a step further. The reason for the grantor's decision must be examined. Where the grantor's action is due to business exigencies unrelated to the dealer—such as a withdrawal from the marketplace, as in *Massey-Ferguson,* or a change in credit card policy, as in this case—I believe the WFDL's prohibitions are inapplicable. Thus, this case is distinguished from cases such as *Kealey,* in which the grantor action stems from some dealer inadequacy. Accordingly, the plaintiff's claim under the WFDL will be dismissed.

*Remaining Claims*

Remus has also asserted a breach of contract claim based on Amoco's collection of a credit card fee. The credit card contract between the parties is silent on the subject of a credit card fee. Remus contends that because of the credit card fee Amoco is no longer buying the credit card slips from him "dollar for dollar". Remus argues that the contract presumes (although it doesn't state directly) that the credit card slips will be purchased at their face value; therefore, when the company charges the 3% fee, it effectively reduces the value of the credit card slips to 97 cents on the dollar.

This argument assumes that the credit card fee must be paid in credit card slips. Amoco points out that the fee can be paid in cash or credit card assignments. At any rate, Remus agreed to participate in

DFC, a component of which, as he acknowledges he knew well in advance, is the credit card fee. While I make no finding on the correctness of Remus' interpretation of the contract, I find that the credit card agreement has been altered by mutual consent.

 Finally, Remus contends that Amoco misrepresented the risks and benefits of the DFC program. Remus' own deposition testimony contradicts this claim. He testified that Amoco representatives had warned him that dealers may lose credit card sales and that, in fact, DFC may hurt dealerships having 50% or more of total sales on credit cards. Remus also testified that Amoco representatives told him the company could not guarantee higher profits or a lower "spread"—the difference between Remus' wholesale cost and that of the "independents". Remus testified that Amoco representatives simply presented the results of the Milwaukee test market and expressed their optimism about the prospects for the rest of the state. Remus has not pointed to any concrete false representation made by Amoco in the course of the introduction of the DFC program. This appears to be a case of disappointed expectations, rather than fraudulent misrepresentation.

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED and this case DISMISSED.