REXNORD, INC., a Wisconsin corporation,
Defendant-Respondent.

Supreme Court

*No. 86–0462. Argued September 6, 1988.—Decided December
22, 1988.*

(On motion for reconsideration, cause remanded for further
proceedings 139 Wis. 2d 593, 407 N.W.2d 873 (1987).)

(Also reported in 433 N.W.2d 8.)

1. **Trademarks, Trade Names and Unfair Competition
§ 17\*—Wisconsin Fair Dealership Law—termination of
dealership—good cause.**
Under Wisconsin Fair Dealership Law, grantor's economic
circumstances may constitute good cause to alter its method
of doing business with its dealers, but such changes must be
essential, reasonable and nondiscriminatory.

2. **Trademarks, Trade Names and Unfair Competition
§ 17.5\*—Wisconsin Fair Dealership Law—purpose and
policy.**
Wisconsin Fair Dealership Law's primary underlying purpose
and policy is to promote compelling interest of public in fair
business relations between dealers and grantors and in
continuation of dealerships on fair basis (Stats § 135.025(2)).

3. **Trademarks, Trade Names and Unfair Competition
§ 17.5\*—Wisconsin Fair Dealership Law—termination
of dealership—standard of measure of good cause.**

---

\* See Callaghan's Wisconsin Digest, same topic and section number.

ZIEGLER CO., INC., a Wisconsin corporation,
Plaintiff-Appellant-Petitioner,

v.

REXNORD, INC., a Wisconsin corporation,
Defendant-Respondent.

Supreme Court

*No. 86–0462. Argued September 6, 1988.—Decided December
22, 1988.*

(Also reported in 433 N.W.2d 8.)

For the plaintiff-appellant-petitioner, there were briefs by *Steven J. Kirschner* and *Ross & Stevens, S.C.,* Madison, and *Lewis A. Remele, Jr., Gregory M. Weyandt* and *Rider, Bennett, Egan & Arundel,* Minneapolis, Minnesota, and oral argument by *Mr. Kirschner.*

For the defendant-respondent there was a brief by *William H. Levit, Jr., Michael B. Apfeld* and *Godfrey & Kahn, S.C.,* Milwaukee and oral argument by *Mr. Apfeld.*

Amicus curiae briefs were filed by *William C. Wolford,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general, for

the Department of Justice, State of Wisconsin; and *William F. Nelson, Margaret A. Satterthwaite* and *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.,* Madison, for the Wisconsin Council of the National Alliance of Franchisees and Dealers and Wisconsin Wine and Spirits Institute.

STEINMETZ, J.   The issue before the court on reconsideration is under what circumstances and upon what conditions does the Wisconsin Fair Dealership Law (WFDL), ch. 135, permit a grantor to change its method of doing business with its dealers, and, further, whether the facts of this case satisfy those circumstances and conditions.

Ziegler Co., Inc. (Ziegler) commenced an action against Rexnord, Inc. (Rexnord) alleging a violation of the WFDL, misrepresentation and breach of contract. Following discovery, the parties each moved for partial summary judgment, with Ziegler claiming that Rexnord terminated the dealership without good cause, and Rexnord claiming that Ziegler was not a dealer as defined in sec. 135.02(2) and (3), Stats.

Judge William D. O'Brien, Eau Claire county circuit court, granted Rexnord's motion for partial summary judgment. In doing so, the trial court did not rule on Ziegler's good cause argument because if Ziegler were not a dealer, the good cause issue was irrelevant and would not have to be resolved.

In an unpublished opinion, the court of appeals affirmed the trial court's decision. After accepting Ziegler's petition for review, this court reversed the decision of the court of appeals and the judgment of the trial court and remanded the case to the trial court for further proceedings on the issue of whether Ziegler was a Rexnord dealer as defined in the WFDL.

*Ziegler Co., Inc. v. Rexnord, Inc.,* 139 Wis. 2d 593, 596, 407 N.W.2d 873 (1987). In that opinion, this court declined to consider the good cause issue.

Rexnord moved and Ziegler joined the motion to this court to consider the good cause issue of this case, and the motion for reconsideration was granted. The premise of the motion was that a resolution of the good cause issue may avoid a protracted trial on the issue of whether or not a dealership existed and, therefore, judicial economy would best be served by determining the good cause issue.

Both parties agree to most of the basic facts of the case. Similarly, both parties believe the undisputed facts provide this court with a sufficient basis to determine the good cause issue. We disagree. The undisputed facts of the record provide an insufficient basis upon which this court can determine the good cause issue, and the case must be remanded for further proceedings on both the issue of whether a dealership existed and on the issue of good cause. The parties may present more evidence in support of the motions for summary judgment, and then the trial court can determine whether there is sufficient evidence to demonstrate that there remains no genuine issue of material fact.

The parties disagreed as to whether their relationship constituted a dealership. This case was previously remanded to the circuit court for a determination of this issue. For purposes of determining the good cause issue, we are asked to assume that a dealership exists as that term is used in the WFDL. Section 135.01, Stats. Whatever the agreement, it was entered into in 1980 for one year and then in 1981 the parties entered into a three-year contract. It is the expiration of this contract on June 30, 1984, and

Rexnord's failure to renew this agreement which gave rise to the current dispute.

In August, 1983, the Process Machinery Division of Rexnord (PMD) informed Ziegler of its decision to allow the agreement to expire and not renew it and thereafter held a number of meetings with Ziegler representatives. In February, 1984, PMD offered Ziegler the opportunity to continue a relationship with PMD by entering into a sales representation agreement denominated as a "tight agency" and provided Ziegler with a letter of understanding outlining its terms. In June, 1984, Ziegler rejected this proposal.

The original agreement between PMD and Ziegler was labeled a "Distributor Agreement." When the distributor agreement was about to expire and PMD attempted to negotiate a new agreement with Ziegler, this agreement was labeled a "Sales Representative Agreement." Both parties refer to the sales representative agreement as creating a "tight agency" relationship, thereby making Ziegler a "tight agent."

The tight agency contrasts with what the parties term a "loose agency." A "loose agent" operates under substantially the same terms as a tight agent; however, the loose agent never signs a written agreement with PMD.

The most significant difference between the expiring relationship and the tight agency is the tight agent's compensation arrangement. Under the previous agreement, Ziegler purchased Rexnord equipment and parts at a substantial discount of PMD's list price and sold them at whatever profit or loss it could. As a tight agent, Ziegler would have received a fixed commission from each sale. The tight agency offered by Rexnord would assign a territory to Ziegler and entitle Ziegler to receive a commission on all parts

and equipment sold in that territory whether or not Ziegler participated in the sale. At present, PMD has 15 tight agents, nine of which were former PMD distributors like Ziegler.

The tight agency would have relieved Ziegler from carrying an inventory of spare parts. Ziegler also would have been relieved of start-up and warranty service. Therefore, Ziegler would no longer have to provide a place of business or service personnel. The parties concede that this record does not develop the effective difference in profit to Ziegler. It is assumed for present purposes that a tight agency would have been at least potentially less lucrative to Ziegler, since the very purpose of the new arrangement was, according to Rexnord, to reduce PMD's cost of sales.

In other respects, the two arrangements were quite similar. Under both arrangements, Ziegler would have had a specific territory. Under both, Ziegler was obligated to extend its best efforts, to maintain sales personnel and to submit periodic market reports. In either case, Rexnord's trademarks and confidential information were protected. Both contained a similar termination clause.

The parties disagree as to whether PMD's decision to discontinue its relationship with Ziegler and other entities was an attempt to increase its profitability or whether PMD was trying to stem ruinous losses. Ziegler allows that PMD experienced losses in 1982 of over $8 million and continued to lose money into 1983. But Ziegler claims the losses were due to the economic recession and its impact on the aggregate (rock crushing) equipment industry which affected Ziegler's sales as well. PMD claims the losses were due to its relationship with Ziegler and other distributorships or dealerships. Whatever the reason, PMD experienced

losses and claims it was attempting to cut its losses by changing its relationship with Ziegler and others. PMD claims to have tried other means to cut its losses with no success. Rexnord claims to have chosen the only remaining possible solution to save on costs. Whereas, Ziegler claims that Rexnord chose the only alternative considered. All the claims of losses, their cause and alternatives are issues of fact.

■ The real issue is whether a grantor (as defined in the WFDL) may alter its method of doing business with its dealers (as defined in the WFDL) to accommodate its own economic problems, or whether it must subordinate those problems—regardless how real, how legitimate, or how serious—in all respects and permanently if the dealer wishes to continue the dealership. We find that the grantor's economic circumstances may constitute good cause to alter its method of doing business with its dealers, but such changes must be essential, reasonable and nondiscriminatory.

Ziegler contends that a grantor may not alter a dealership for economic reasons relating to the grantor only. Thus, no matter how severe the economic crises at PMD, Rexnord had to execute an identical contract with Ziegler when the old contract expired on June 30, 1984, or be liable for WFDL damages.

This position is unjust and unreasonable. The WFDL meant to afford dealers substantial protections previously unavailable at common law; however, the Wisconsin legislature could not have intended to impose an eternal and unqualified duty of self-sacrifice upon every grantor that enters into a distributor-dealership agreement. Section 135.025(2), Stats., states:

"(2)   The underlying purposes and policies of this chapter are:

"(a)   To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

"....

"(d)   To govern all dealerships, including any renewals or amendments ...."

It is obvious from this section of the WFDL that mutual fairness must be present between the grantor and the dealer and that the legislature contemplated possible changes in existing dealership relations.

The WFDL's primary underlying purpose and policy is "[t]o promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis." *Id.*

In *St. Joseph Equipment v. Massey-Ferguson, Inc.,* 546 F. Supp. 1245, 1248–49 (W.D. Wis. 1982), the court stated:

"It would hardly be consistent with notions of 'fair business relations' or 'the continuation of dealerships on a fair basis' to force a grantor to endure substantial financial loss to enable a dealer to continue selling certain products....

"....

"... The WFDL may well serve to shield dealers from some harsh treatment at the hands of grantors, but it could hardly be expected to isolate them from economic reality which, as we all know only too well, is harsh enough but not necessarily unfair, except perhaps in some cosmic sense unrelated to business practicalities."

*Accord, Lee Beverage Co. v. I.S.C. Wines of California,* 623 F. Supp. 867, 870 (E.D. Wis. 1985). The argument that a grantor may never attempt to change its method of doing business with a dealer to accommodate its own concerns, no matter how great the need and regardless of the fact that the dealership agreement has expired, is not acceptable.

Section 135.03, Stats.,[1] gives a grantor the right to terminate, cancel, or fail to renew a dealership for "good cause." Ziegler argues that good cause can be measured only by the dealer's performance under the dealer contract. That position does not promote fair business relationships. The good cause element may be met if a dealer lacks substantial compliance with the terms of the new contract, provided the altered terms are essential, reasonable and nondiscriminatory. If the grantor is demonstrably losing substantial amounts of money under the relationship, it may constitute good cause for changes in the contract.

Good cause is defined in sec. 135.02(4)(a), Stats., as follows:

> "Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; ...."

---

[1]Section 135.03, Stats., provides as follows:

> "**Cancellation and alteration of dealerships.** No grantor, directly or through any officer, agent or employe, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor."

316

Good cause is measured by the dealer's substantial compliance with requirements "imposed" or "sought to be imposed by the grantor." The phrase "sought to be imposed" suggests legislative recognition that the grantor has some ability to change the dealership—some right on the part of the grantor to change its method of doing business with its dealers.

When construing statutes, meaning should be given to every word, clause and sentence and a construction which would make part of a statute superfluous should be avoided whenever possible. *Kollasch v. Adamany,* 104 Wis. 2d 552, 563, 313 N.W.2d 47 (1981). The phrase "requirements imposed" is dissimilar to the phrase "requirements ... sought to be imposed" and therefore means that the phrases bear different meanings; otherwise, one or the other would be superfluous. The phrase "requirements ... sought to be imposed" can only refer to a grantor's changes in a dealership's established method of doing business.

The requirements sought to be imposed by the grantor must be essential, reasonable and nondiscriminatory. Section 135.02(4)(a), Stats. If the requirements meet these criteria, a dealer's refusal to accept them will constitute substantial noncompliance as put forth in the provided definition of good cause. *Id.* This failure to comply with such requirements in turn would be good cause for termination, cancellation, or failure to renew. Section 135.03. Put another way, the grantor may terminate, cancel or fail to renew a dealership if the dealer refuses to accept proposed changes in the dealership relationship provided that the changes are essential, reasonable and not discriminatory between similarly situated dealers. In deter-

mining whether the changes are essential and reasonable, a balancing must be done. Whether the changes are essential and reasonable must also be considered in regard to the effect on the grantee. For instance, the grantee's reasonably necessary investments in or for the dealership and whether the changes affect grantee's primary business must be considered. The balance test may be applied by allowing the grantor to avoid continuing heavy losses by the recovery of damages for reasonably necessary investment by the grantee on termination of the agreement.

In enacting the WFDL, the legislature intended to equalize the power of grantors and dealers; it did not intend to insulate dealers from all economic reality at the expense of grantors. The essential requirements of the statute allow a grantor to impose changes which must include those designed to accommodate the grantor's own economic problems. Any contrary interpretation of the statute would place all risk of loss due to fundamental economic change on the grantor in perpetuity.

The majority of courts considering this issue has concluded that any construction which would preclude a grantor from taking its own legitimate economic problems into account would be unreasonable. In *St. Joseph Equipment,* 546 F. Supp. at 1247–48, the grantor/manufacturer, faced with substantial losses with regard to its sales of construction machinery, decided to withdraw completely from the North American market, resulting in a de facto termination of the plaintiff. The court reasoned that, although a grantor's economic exigencies were not expressly recognized by the WFDL, to exclude economic justification from the definition of good cause would raise even greater problems:

"Such a conclusion raises some disturbing questions: Is a company with a poorly-selling product compelled to keep making and/or selling it, even at a loss, because sec. 135.03 won't permit it to drop the product? Must a company desirous of withdrawing from a particular geographic market—the entire North American continent, for example—continue operating in that market, even at a loss, because the effect of such a withdrawal on dealerships would be impermissible under the Act? Because the Act's prohibitions extend also to non-renewals, would a company in the above situations be compelled to renew dealerships in perpetuity or until its ultimate financial ruin? Should dealers such as the plaintiff be permitted to extract damage awards from corporate grantors simply because those grantors have become victims of a business downturn? To answer any of these questions in the affirmative would surely be to let the tail wag the dog...."

*Id.* The court went on to hold that the grantor's economically motivated termination did not violate the WFDL. This same result was reached in *Remus v. Amoco Oil Co.*, 611 F. Supp. 885, 887 (E.D. Wis. 1985), *aff'd* 794 F.2d 1238 (7th Cir. 1986) where the court stated:

"Common sense suggests that when a company has determined that an aspect of its business should be changed in order to stay competitive, it has good cause to make the change provided that it does so in a non-discriminatory manner."

In *Remus v. Amoco Oil Co.*, 794 F.2d 1238 (7th Cir. 1986) the Seventh Circuit Court of Appeals condoned the grantor's unilateral and system-wide change of minor terms of the franchise agreement. *Accord,*

*Bimel-Walroth Co. v. Raytheon Co.,* 796 F.2d 840 (6th Cir. 1986) (termination of dealerships as part of "reasonable marketing strategy" constituted "good cause" under the WFDI); *Lee Beverage,* 623 F. Supp 867 (grantor's economic needs in connection with the sale of the subject product lines constituted "good cause" justifying its termination of the distributorship agreement). *See also American Mart Corp. v. Joseph E. Seagram & Sons,* 824 F.2d 733 (9th Cir. 1987); *Amoco Oil Corp. v. Dickson,* 378 Mass. 44, 389 N.E.2d 406 (1979) (the meaning of "due cause" under a similar statute of Massachusetts may include the grantor's legitimate economic decisions). In *Kealey Pharmacy & Home Care Serv. v. Walgreen Co.,* 539 F. Supp. 1357, 1366 (W.D. Wisconsin 1982), that court recognized that terminations of dealerships were permissible if for "good cause." If good cause were lacking in such termination or cancellation, then "[a]ny dealer whose dealership is terminated in violation of the statute has one remedy only: a suit for damages or injunctive relief or both."

The need for change sought by a grantor must be objectively ascertainable. The means used by a grantor may not be disproportionate to its economic problem. What is essential and reasonable must be determined on a case-by-case basis. The dealer is also protected from discriminatory treatment. This requirement preserves a dealer's competitive position in regard to other dealers and effectively discourages a grantor from acting on improper motives but, because it presumptively requires systemic changes, it tends to reinforce the requirement that the change be essential.

A jury is to be the finder of fact where any material facts are disputed or where different infer-

ences may be drawn from the facts. *Millonig v. Bakken,* 112 Wis. 2d 445, 449, 334 N.W.2d 80 (1983). Only the trier of fact can determine what was essential, reasonable and nondiscriminatory under the facts of this case. *See also Ford Motor Co. v. Lyons,* 137 Wis. 2d 397, 451, n. 16, 405 N.W.2d 354 (Ct. App. 1987) (court recognizing that what constitutes a commercially reasonable sale is a question of fact for the trier of fact because the answer is dependent upon the surrounding facts and circumstances); *Lobermeier v. General Tel. Co. of Wisconsin,* 119 Wis. 2d 129, 145, 349 N.W.2d 466 (1984) ("[t]he question is one of fact for the jury—what was a reasonable course of conduct, under the circumstances, to mitigate the injuries or damages").

Rexnord contends the parties have agreed that there are no contested facts material to the good cause issue, and that the uncontested facts establish that PMD had no choice but to do what it did. Yet, Ziegler argues that Rexnord's change in policy was not a life or death situation and that Rexnord did not intend to close sales of this product or to sell off its process machinery division at the time it terminated Ziegler. Rexnord responds by contending that the evidence shows that PMD was losing millions of dollars per year and that a change in its distribution system was the last available option to reduce those losses. Rexnord also claims that it is uncontested that the change in the distribution system was the only practical solution to PMD's economic forecast, and, therefore, it was reasonable as a matter of law. We find that the issue is in contest and therefore the trier of fact must determine the reasonableness of the changes sought by Rexnord. We hold that before a grantor's change in

a dealership is acceptable, the changes must be essential and reasonable, and those are conclusions for the trier of fact to make on a fully developed record.

The issue of lack of discrimination in the tight agency contract should also be determined by the trier of fact. Rexnord claims Ziegler was offered a more desirable contract than that offered to any other former distributor. Rexnord claims only one former distributor was given an opportunity which was not made available to Ziegler, that is, Rexnord's rental of the distributor's warehouse space. On the record before us we will not determine whether Rexnord's changes were nondiscriminatory.

We hold that when a dealer refuses to substantially comply with the terms of a contract offered by the grantor, the grantor may have good cause to terminate, cancel or fail to renew the relationship at the expiration of the original contract, provided the requirements imposed by the grantor are essential, reasonable and nondiscriminatory. This case does not involve a termination of the original contract, but rather a failure to renew the relationship because the dealer allegedly refuses to substantially comply with essential, reasonable and nondiscriminatory requirements sought to be imposed on the dealer by the grantor.

Due to our analysis we do not address Rexnord's argument that the WFDL is unconstitutional because it does not consider a grantor's legitimate economic concerns.

We remand the case to the trial court to determine the issues of dealership and good cause in the order which will most effectively conserve judicial time.

*By the Court.*—Cause remanded for further proceedings.

SHIRLEY S. ABRAHAMSON, J. (*concurring*). While I agree with the majority that this case must be remanded for further proceedings, I do not agree with the majority's interpretation of the dealership statute. I conclude, as does the Department of Justice in its amicus curiae brief, that the interpretation adopted by the majority opinion ignores the plain language of the statute and subverts the legislative intent and purpose underlying the Wisconsin Fair Dealership Law.

The Wisconsin Fair Dealership Law is a remedial statute, intended to protect dealers whom the legislature recognizes as having an inferior bargaining position in negotiating dealership agreements with grantors (franchisors). Section 135.025 (2) Stats.[1] The essence of the law is the provision that the grantor cannot terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealer-

---

[1]Sec. 135.025(2), Stats. 1985–86, provides:

**135.025 Purposes; rules of construction; variation by contract. (1)** This chapter shall be liberally construed and applied to promote its underlying remedial purposes and policies.

(2) The underlying purposes and policies of this chapter are:

(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis:

(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;

(d) To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States.

ship agreement without *good cause.* Section 135.03
(emphasis added).[2] The legislature's definition of good
cause is the single most important aspect of the
dealership statute. Section 135.02(4) defines good
cause to mean that the dealer has failed to carry out
an important part of its responsibilities.[3]

The majority does not clearly state its holding,
and therefore the circuit court will, in my opinion,
have difficulty applying this decision on remand. The
majority opinion apparently redefines good cause to
mean that the grantor may, for its own economic
reasons, substantially change the competitive circum-
stances of a dealership agreement by imposing nondis-
criminatory, essential and reasonable new require-
ments on the dealer. Majority at 314, 317. Under the
majority's scheme, the fact-finder determines whether
the new requirements imposed by the grantor are
nondiscriminatory, essential and reasonable by engag-
ing in a balancing test which the opinion fails to
define. Furthermore, according to the majority, if the

---

[2]Section 135.03, Stats. 1985–86, provides:

**135.03 Cancellation and alteration of dealerships.** No grant-
or, directly or through any officer, agent or employee, may
terminate, cancel, fail to renew or substantially change the
competitive circumstances of a dealership agreement without
good cause. The burden of proving good cause is on the grantor.

[3]Section 135.02(4), Stats. 1985–86, provides:

(4) "Good cause" means:
(a) Failure by a dealer to comply substantially with essen-
tial and reasonable requirements imposed upon him by the
grantor, or sought to be imposed by the grantor, which require-
ments are not discriminatory as compared with requirements
imposed on other similarly situated dealers either by their terms
or in the manner of their enforcement; or
(b) Bad faith by the dealer in carrying out the terms of the
dealership.

dealer fails to comply with the new requirements, then the grantor has good cause to terminate, cancel or fail to renew the dealership agreement.

I do not join the majority opinion for several reasons.

First, the majority's interpretation of the good cause requirement focuses on the grantor and therefore contravenes the plain language of sec. 135.02 (4), Stats. which focuses entirely on the conduct of the dealer. See *Remus v. Amoco Oil Co.*, 794 F.2d 1238, 1240 (7th Cir. 1986). As Judge Crabb noted in *Kealey Pharmacy & Home Care Serv. v. Walgreen Co.*, 539 F. Supp. 1357, 1366 (W.D. Wis. 1982), aff'd, 761 F.2d 345 (7th Cir. 1985): "The adverse impact upon a dealer of a unilateral termination of its dealership is not lessened because the grantor is acting in good faith for sound business reasons."

Second, the majority's interpretation of the good cause requirement contravenes the legislative purpose: it significantly limits the protection that the legislature intended to provide to Wisconsin dealers. The legislature created the Fair Dealership Law in order to protect dealers from grantors' inherently superior economic influence and bargaining power. The courts ought to apply the statute with this legislative purpose in mind.[4]

---

[4]Attorney Michael A. Bowen foresaw the possibility of a court undercutting the legislative purpose by its definition of good cause. He wrote: "Based on what is available, however, and on the fact that Chapter 135 has in general encountered pronounced judicial hostility at the appellate level throughout its existence, albeit with some notable exceptions, there is substantial reason to believe that 'or sought to be imposed' will turn out to be a loophole of major proportions in the protection that the Legislature thought it was providing to dealers when it adopted the statute."

Third, the majority opinion's undefined balancing test for good cause seems to put the judge and jury smack in the middle of second-guessing business decisions. I cannot believe the legislature intended such a result.

Lastly, the majority opinion apparently creates a new remedy for dealers who will be harmed by the majority's newly established rule favoring grantors. I am puzzled that the majority appears to conclude that even after the court determines that a grantor is imposing reasonable, essential and nondiscriminatory new requirements designed to protect its economic interest, the court may award a dealer damages for its "reasonably necessary investments." Without explanation or rationale, the majority opinion states: "The balancing test may be applied by allowing the grantor to avoid continuing heavy losses by the recovery of damages for reasonably necessary investment by the grantee on termination of the agreement." Majority at 318. Furthermore, it is unclear how this new damage rule fits with the statutory damage provisions in secs. 135.045 and 135.06.

The Fair Dealership Law, as I read it, allows the grantor to impose, without the dealer's consent, essential, reasonable and nondiscriminatory changes that do not terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement. If the grantor, however, wishes to terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement for reasons relating to the grantor's economic self-

Bowen, "Good Cause," in ATS-CLE *Wisconsin Fair Dealership Law,* State Bar of Wisconsin, April 1988. See also Bowen and Butler, *The Wisconsin Fair Dealership Law,* p. 5–43 (State Bar of Wisconsin 1988).

interest, the statute gives the dealer a remedy. The court may enjoin the grantor or the court may award the dealer damages to compensate the dealer for lost profits or lost business value. If the grantor's economic condition is precarious, then of course the dealer's damages probably would not be substantial. This interpretation of the statute comports with the plain language of the statute and with legislative intent, protects both the grantor and dealer, is easy to apply and makes good business sense.

The majority opinion gives the grantor much greater power than the legislature intended and negates, to a large extent, the protection that the legislature intended to provide dealers by adopting the Wisconsin Fair Dealership Law. Therefore I cannot join the majority in its interpretation of good cause.

I am authorized to state that Chief Justice Nathan S. Heffernan joins in this concurring opinion.