In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 16-3682

WINEBOW, INC.,

*Plaintiff-Appellee,*

*v.*

CAPITOL-HUSTING CO. , INC. &
L'EFT BANK WINE CO. LIMITED,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 15-cv-225 — **David E. Jones**, *Magistrate Judge.*

———————————

ARGUED APRIL 11, 2017 — DECIDED AUGUST 16, 2017

———————————

Before WOOD, *Chief Judge*, and FLAUM and EASTERBROOK, *Circuit Judges*.

WOOD, *Chief Judge*. Eighteen years ago, Wisconsin Governor Tommy Thompson vetoed portions of an appropriations bill that imposed new regulations on alcohol dealers and distributors. In doing so, the governor hoped to diminish the regulatory burden on wine dealerships. In the present case, which pits an upstream wine business against

two wholesale wine distributors, the question is whether Governor Thompson achieved that goal. The answer turns on the proper understanding of state law. Because there is no guiding precedent and the issue is of great practical importance, we respectfully certify to the Supreme Court of Wisconsin the question whether wine dealerships are automatically to be considered as "intoxicating liquor" dealerships for purposes of the Wisconsin Fair Dealership Law. See Wis. Stat. § 821.01; Cir. R. 52.

**I**

Plaintiff Winebow, Inc., imports and distributes wines to downstream wholesalers. It wants to cut its ties with two wholesale distributors, defendants Capitol-Husting and L'Eft Bank Wine, to whom we refer collectively as the Distributors. Winebow began using Capitol-Husting as a distributor of its wines in 2004; it added L'Eft Bank in 2009. Over the years, Winebow granted the Distributors the exclusive right to sell and distribute Winebow products within specified regions of Wisconsin. Evidently the relationship suited the Distributors, who bought "substantial amounts" of Winebow's wine in recent years. Winebow, however, became dissatisfied, and in February 2015 it abruptly terminated both distributorships. No express agreement with either counterparty stood in its way, but the Distributors took the position that the Wisconsin Fair Dealership Law bars Winebow from doing so—at least without any financial penalty. Whether they are correct depends on the language of that statute, to which we now turn.

The Wisconsin Fair Dealership Law ("the Law") restricts the circumstances under which certain sellers (termed "grantors," see Wis. Stat. § 135.02(5)) unilaterally may stop doing business with their existing distributors (known as "dealers," per Wis. Stat. § 135.02(2)—we call them distributors here). Grantors may take this step only if they have "good cause" to do so. See Wis. Stat. § 135.03; see also Wis. Stat. § 135.02(4) (defining "good cause"); *Ziegler Co., Inc. v. Rexnord, Inc.*, 433 N.W.2d 8, 12–14. (Wis. 1988) (interpreting the statutory definition). The Law is premised on the idea that dealer-grantors have "inherently … superior economic power." Wis. Stat. § 135.025(2)(b). It seeks to "prevent[] suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand." *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 419 (7th Cir. 1990). It does so by supplementing the contractual and common law obligations that grantors owe to their distributors. See Wis. Stat. § 135.025(2)(c) & (3). If a grantor contravenes the law by terminating or substantially impairing an existing relationship with a distributor, that distributor may recover damages, injunctive relief, and attorney's fees. Wis. Stat. § 135.06.

The Law does not regulate all grantor-distributor relationships, however. Initially, it addressed only business relationships (defined as "dealerships") in which there was a "community of interest" between the grantor and the distributor. Wis. Stat. § 135.02(3)(a). A "community of interest" was defined in the statute as a "continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis. Stat. § 135.02(1). These are hardly crisp standards, and so it is not surprising that courts are frequently asked to decide

whether such an interest is present. See Note, Kevin Scott Dittmar, *Foerster, Inc. v. Atlas Metal Parts: The Wisconsin Supreme Court Takes a Narrow View of the Dealer's Financial Interest Protected by the Wisconsin Fair Dealership Law*, 1985 WIS. L. REV. 155, 156 (1985); see also *Ziegler*, 407 N.W.2d at 877 ("The community of interest requirement has been difficult to delimit with any precision.").

In 1999, the Wisconsin General Assembly sought to broaden the Law to ensure that all "intoxicating liquor" dealerships were protected. To that end, it eliminated the need to prove "community of interest" for those businesses. It included changes to this effect in the state's budget bill, Act 9.

Two of those changes are central here. First, the General Assembly amended the definition of a "dealership" so that large-volume distributors of "intoxicating liquor" were brought under the umbrella of the statute's definition of a protected "dealership." This revised definition of a "dealership" expressly incorporates the definition of "intoxicating liquor" in the chapter regulating alcohol sales, Wis. Stat. § 125.02(8), which includes wine:

> … all ardent, spirituous, distilled or *vinous* liquors, liquids or compounds, whether medicated, proprietary, patented or not, and by whatever name called, containing 0.5% or more of alcohol by volume, which are beverages, but does not include "fermented malt beverages."

Wis. Stat. § 125.02(8) (emphasis added).

Second, the legislature created an entirely new section in the Law: Wis. Stat. § 135.066. This new provision expressed the legislature's desire for a competitive and stable wholesale

market and the need for new rules governing a party's acqui-
sition of an entity that has an existing intoxicating liquor deal-
ership. These industry-specific rules were to supplement, ra-
ther than replace, the other regulations in the Law. The new
section expressly incorporated the definition of "intoxicating
liquor" from the pre-existing Wis. Stat. § 125.02(8).

Several of these changes never came into effect, because
Governor Thompson objected to the idea of treating wine
dealerships the same as other alcohol dealerships. On
October 27, 1999, he partially vetoed the appropriations bill,
striking a significant portion of the legislature's changes to the
Law. Wisconsin grants its governors power to strike out
significant language in appropriations measures, even when
doing so alters the meaning of the statute, but they may not
add new language. See *State ex rel. Wis. Senate v. Thompson*,
424 N.W.2d 385, 388, 393 (Wis. 1988) (the governor may "veto
individual words, letters, and digits, … as long as what
remains after veto is a complete, entire, and workable law.").
Governor Thompson thus had to work with the language the
lawmakers sent him. This required some legerdemain.

First, the governor struck the cross-reference to the exist-
ing regulatory definition of "intoxicating liquor" in the provi-
sion creating the new definition of a protected dealership:

> [Wis. Stat. §] 135.02(3)(b) [A protected dealership is
> created by] [a] contract or agreement, either ex-
> pressed or implied, whether oral or written, be-
> tween 2 or more persons by which a wholesaler, as
> defined in s. 125.02(21), is granted the right to sell
> or distribute intoxicating liquor~~, as defined in s.
> 125.02(8),~~ or use a trade name, trademark, service

mark, logotype, advertising or other commercial symbol related to intoxicating liquor … .

We will refer to this language, as altered by the governor's veto, as the "categorical" provision or "*per se*" definition of a dealership entitled to the protections of the Law.

In addition, he vetoed significant portions of the new industry-specific sections. He struck the bulk of the definitions and regulations in subsections (2)–(4), leaving on the books only the following:

(2) DEFINITIONS. ~~In this section:~~

(a) "Intoxicating liquor" has the same meaning given in s. 125.02(8)~~.~~

~~(b) "Net revenues" means the gross dollar amount received from the sale of intoxicating liquor~~ **minus** ~~adjustments for returns, discounts and allowances.~~

~~(c) "Wholesaler" has the meaning given in s. 125.02(21).~~

~~(d)~~ **"Wine"** ~~has the meaning given in 125.02(22).~~

~~(3) LIABILITY OF TRANSFEREE OF INTOXICATING LIQUOR GRANTOR.~~

~~(a) In this subsection:~~

~~1. "Goodwill" includes the use of a trademark, trade name, logotype or other commercial symbol, and the use of a variation of a trademark, trade name, logotype, advertisement or other commercial symbol.~~

~~2. "Transferee" means a person who acquires any asset or activity of a grantor's intoxicating liq-~~

~~uor business and who uses the goodwill associated with the intoxicating liquor of the grantor.~~

~~(b) A transferee shall be bound by each of the grantor's dealerships with the grantor's wholesalers and consequently shall be considered a grantor for the purposes of, and shall comply with, the requirements of this chapter.~~

~~(4) CHANGE IN OWNERSHIP.~~

~~(a) In this subsection, "successor wholesaler" means a wholesaler who succeeds to the management, ownership or control of a wholesaler or wholesaler's business or any part of a wholesaler's business by any means including by stock purchase, sale of assets or transfer or assignment of a brand of intoxicating liquor that is the subject of a dealership agreement.~~

~~(b) A change in the management, ownership or control of a wholesaler, a wholesaler's business or any part of a wholesaler's business is not good cause for a grantor to terminate, cancel, fail to renew or substantially change the competitive circumstances of its dealership with a successor wholesaler if the successor wholesaler meets the grantor's reasonable and material qualifications for wholesaler applicants in effect at the time of the change. If the successor wholesaler meets the grantor's reasonable and material qualifications for wholesaler applicants in effect at the time of the change, the successor wholesaler~~

~~shall succeed to the dealership rights of the predecessor wholesaler and the grantor shall continue to be bound by the dealership.~~

The careful reader will spot the undeleted word "minus" in former 2(b), and the undeleted word "wine" in former 2(d). After the governor's surgery, therefore, section 2(a) read "'Intoxicating liquor' has the same meaning given in s. 126.02(8) **minus wine**." Following the convention used by the parties, we refer to this section as the "minus wine" provision, Wis. Stat. § 135.066(2).

The governor left intact the legislative findings in subsection 1 and a severability provision in subsection 6. He edited the nonapplicability provision to strike two phrases that had excluded wine dealerships, presumably believing the language was superfluous:

(5) **NONAPPLICABILITY.** This section does not apply to any of the following dealerships:

(a) Dealerships in which a grantor, including any affiliate, division or subsidiary of the grantor, has never produced more than 200,000 gallons of intoxicating liquor in any year.

(b) Dealerships in which the dealer's net revenues from the sale of all of the grantor's brands of intoxicating liquor~~, except wine,~~ constitute less than 5% of the dealer's total net revenues from the sale of intoxicating liquor~~, except wine,~~ during the dealer's most recent fiscal year preceding a grantor's cancellation or alteration of a dealership ~~and the dealer's net revenues from the sale of all of the grantor's brands of wine~~

> ~~constitute less than 5% of the dealer's total net~~
> ~~revenues from the sale of wine during the~~
> ~~dealer's most recent fiscal year preceding a~~
> ~~grantor's cancellation or alteration of a dealer-~~
> ~~ship~~.

Wis. Stat. § 135.066(5).

Governor Thompson paired his action with a written statement that discussed the legislature's changes to the Law and his alterations to the legislature's work. In that veto message, he said that he was "partially vetoing these provisions so that wine will be excluded from treatment … because I object to wine being treated the same as intoxicating liquor." His changes to the bill became law because the General Assembly failed to override his partial veto. The law has aged over the last 18 years; legislators have not made any adjustments to the "intoxicating liquor" provisions since 1999.

Winebow brought a declaratory judgment action in the district court seeking confirmation that the statutory restrictions on dealership terminations do not apply to wine dealerships, in keeping with Governor Thompson's intent. The defendants counterclaimed that their distributorships were protected under both the "community of interest" definition and by the *per se* "intoxicating liquor" definition in Wis. Stat. § 135.02(3)(b). They later abandoned their first argument. At this point their position turns on the question whether the term "intoxicating liquor" includes wine. The district court concluded that it does not. It granted Winebow's motion for judgment on the pleadings, based on its conclusion that wine dealerships do not fall within the "intoxicating liquor" dealerships protected by the Law.

**II**

The sole question before us is whether an "intoxicating liquor" dealership, as defined by Wis. Stat. § 135.02(3)(b), includes one that involves wine. If it does not, then Winebow is free to cease doing business with Capitol-Husting and L'Eft Bank Wine without further ado. If wine dealerships are covered, however, then Winebow cannot unilaterally terminate its relationship with the Distributors without a showing of good cause. Because this is an appeal from the grant of a judgment on the pleadings and concerns the interpretation of a statute, our review is *de novo*. See *Laborers Local 236, AFL-CIO v. Walker*, 749 F.3d 628, 632 (7th Cir. 2014); *Boyd v. Illinois State Police*, 384 F.3d 888, 896 (7th Cir. 2004).

**A**

The Distributors naturally prefer the greater protection that the "good cause" standard confers, and so they argue that wine dealerships are included in the *per se* dealership definition in Wis. Stat. § 135.02(3)(b). In the alternative, they argue that the statute is ambiguous but that the term "intoxicating liquor" should be construed as including wine, either as a matter of policy or as a consequence of the supposed "plain meaning" of the phrase. Winebow counters that the "minus wine" provision pulls any wine dealership out of the *per se* definition. The state courts have yet to speak to this issue.

Because our jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332(a)(1), we must interpret the law as we think Wisconsin's courts would. *Laborers Local 236*, 749 F.3d at 634. For questions of statutory interpretation, Wisconsin courts (like most) begin with the text of the law. *Tammi v. Porsche Cars N. Am., Inc.*, 768 N.W.2d 783, 790 (Wis. 2009). This

ensures that the judiciary gives proper deference "to the policy choices enacted into law by the legislature." *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 681 N.W.2d 110, 124 (Wis. 2004). "[M]eaning should be given to every word, clause and sentence[,] and a construction which would make part of a statute superfluous should be avoided whenever possible." *Ziegler*, 433 N.W.2d at 12. If the meaning of the law is clear from the text, then the analysis ends. *Id*. Only when "reasonable persons could disagree as to [the statute's] meaning" is it ambiguous. *State v. Delaney*, 658 N.W.2d 416, 420 (Wis. 2003).

We have done our best to decipher what this law means, based on the text that remained after the governor took his red pencil to it. Unfortunately, we are forced to conclude that the plain language does not tell us whether wine dealerships fall within the category of "intoxicating liquor" dealerships created by Wis. Stat. § 135.02(3)(b).

A number of considerations favor Winebow's position. First and most significant is the presence of the "minus wine" definition of "intoxicating liquor" in Wis. Stat. § 135.066(2). What could that mean other than to exclude wine distributorships from the Law's termination provisions? Further supporting Winebow is the fact that this section contains the Law's only definition of "intoxicating liquor." Logically, the "minus wine" provision would serve no function if it did not set the definition throughout the Law. And the definition is practically the only thing left in Wis. Stat. § 135.066, other than some legislative findings, the non-applicability section, and a severability provision, none of which is affected by the "minus wine" language. The Distributors' cramped reading of the minus-wine language

thus risks making that language meaningless—something Wisconsin courts disfavor in interpreting statutes. *Landis v. Physicians Ins. Co. of Wis., Inc.*, 628 N.W.2d 893, 898 (Wis. 2001); *Ziegler*, 433 N.W.2d at 12. Wisconsin courts also tend to assume consistent interpretations of the same term. When a word or phrase appears repeatedly in a statute, it is "a reasonable deduction" that the legislature intended it to have the same meaning throughout. *Coutts v. Wis. Ret. Bd.*, 562 N.W.2d 917, 923 (Wis. 1994). This rule of thumb favors Winebow's argument that a wine dealership is not a statutory "intoxicating liquor" dealership.

But there is another side to the coin—one that favors the Distributors. Just as the "minus wine" provision is not expressly limited to Wis. Stat. § 135.066, it also does not expressly extend to the entire chapter. Worse, the "minus wine" definition is *not* in the "Definitions" section of the Law. See Wis. Stat. § 135.02. That definitional section expressly states that it applies throughout Chapter 135. Wisconsin courts take into account the "structure of the statute in which the operative language appears" when interpreting language, seeking to place a term "in the context in which it is used; not in isolation but as part of a whole … ." *Kalal*, 681 N.W.2d at 124. That approach seems to boost the Distributors' position.

But to win, the Distributors must do more than pour the "minus wine" definition into Wis. Stat. § 135.066. They also must show that "intoxicating liquor," as that phrase is used in the *per se* definition, includes wine. This is a challenging task because the governor eliminated the cross-reference that had defined that term; thus, there is no express statutory language on their side. Wisconsin courts generally apply the "common,

ordinary, and accepted meaning" of undefined terms, *Masri v. State Labor & Indus. Review Comm'n*, 850 N.W.2d 298, 307–08 (Wis. 2014). Relying on that practice, the Distributors urge that wine is commonly regarded as an "intoxicating liquor." Their brief points to four instances where some variation of the phrase "beer, wine and *other* liquor" (emphasis added) appears somewhere. (It is a random collection of sources, to be sure: a newspaper article from 2011; the text on a health and baby products website; and an article in the Everyday Jewish Living section of the Orthodox Union website.) The word "other," the Distributors argue, shows that beer and wine are commonly regarded as types of liquor.

We are not inclined to assign dispositive weight on such an eclectic basis to a colloquial phrase. One could as easily point out that the phrase "beer, wine, and liquor"—which suggests three distinct items—also appears commonly in the world at large. See, *e.g.*, Roberto A. Ferdman, *Where the Biggest Beer, Wine, and Liquor Drinkers Live in the U.S.*, Wonkblog, WASHINGTON POST, July 29, 2014, https://www.washing-tonpost.com/news/wonk/wp/2014/07/29/where-the-biggest-beer-wine-and-liquor-drinkers-live-in-the-u-s/?utm_term=.39bb6407d67c (visited August 15, 2017) (showing average consumption per person, per state, of beer, of wine, and of spirits). Dictionary definitions are similarly inconclusive. See, *e.g., Liquor*, Merriam-Webster Dictionary ("a *usually* distilled rather than fermented alcoholic beverage") (emphasis added); see also *Kalal*, 681 N.W.2d at 125 ("Many words have multiple dictionary definitions; the applicable definition de-pends upon the context in which the word is used.").

If we conclude that the term "intoxicating liquor" is ambiguous, Wisconsin law orders us to look at the "legislative history, scope, context, and subject matter" of the law to ascertain the meaning. *State v. Washara Cnty. Bd. of Adjustment*, 679 N.W.2d 514, 521 (Wis. 2004). But even these sources fail to clear the haze. Wisconsin lawmakers unquestionably wanted to include them in the *per se* category. Governor Thompson did not, and exercised his amendatory veto to try to effectuate a distinction between wine dealerships and the others, as he explained in his veto message. Wisconsin treats such messages as "part of the legislative history and … evidence of legislative intent." *Landwehr v. Landwehr*, 715 N.W.2d 180, 189 (Wis. 2006); accord *In re Paternity of Jeremy D.L.*, 503 N.W.2d 275, 277 & n.6 (Wis. 1993) (characterizing the governor's veto message as "legislative history" and stating that it "is evidence of a statute's meaning"). Whether the governor succeeded in doing so is the question before us.

In light of all this, we cannot decide with any confidence whether the "minus wine" provision defines "intoxicating liquor" as used throughout the Fair Dealership Law and, if it does not, whether an "intoxicating liquor" dealership, per Wis. Stat. § 135.02(3)(b), includes wine dealerships. We also reject the invitation to read the statute as if it included wine, based on broader policy concerns, because such a move would conflict with the commitment of Wisconsin's courts to rest the meaning of a statute on its text, not on a vague notion of legislative intent. See *Kalal*, 681 N.W.2d at 126.

**B**

Rather than attempt the necessary disambiguation ourselves, we believe that the better course is to ask the Wisconsin Supreme Court for guidance. Although neither

party asked us to certify this question of statutory scope to the Wisconsin Supreme Court, we may exercise our discretion to do so *sua sponte* under Circuit Rules. Cir. R. 52(a). We raised this possibility during oral argument.

We have the authority to certify to a state's highest court questions of state law that will control the outcome of a pending case, provided that the state court is permitted to entertain such questions. Cir. R. 52. Wisconsin allows such questions. Wis. Stat. § 821.01. State law empowers the Wisconsin Supreme Court to choose to answer questions we certify to it, so long as the question is legal in nature, may be determinative of the case pending, and there is no controlling precedent from the state supreme or appellate courts. Wis. Stat. § 821.01. These guidelines mirror those that our court uses to determine when it is appropriate to exercise our discretion to certify a question. See *Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, 732 F.3d 755, 766 (7th Cir. 2014) (listing considerations used for determining whether certification is appropriate).

This case fits the bill. First, it presents a legal question—the proper interpretation of this statute—on which there is no guiding precedent. Neither Wisconsin's highest court nor a state appellate court has determined whether the *per se* "intoxicating liquor" dealership definition in Wis. Stat. § 135.02(3)(b) includes wine dealerships. Moreover, the district court in our case is the only federal court that has weighed in. All this makes the question suitable for certification. See *Nat'l Cycle, Inc. v. Savoy Reinsurance Co. Ltd.*, 938 F.2d 61, 64 (7th Cir. 1991) ("Certification eliminates the need to expend judicial resources predicting how another court will decide a question. Once we have invested the time

and effort to make the prediction, the costs have been sunk."). The Wisconsin Supreme Court's answer about the scope of the law will be outcome determinative because Winebow's suit for declaratory judgment concerns only the scope of the Law.

Another reason why this case is a good candidate for certification is the likelihood of future litigation under the Law and the public policy considerations implicated. The scope of the Law has been the subject of numerous cases, many of which the Wisconsin Supreme Court itself has resolved. *E.g. Benson v. City of Madison*, 897 N.W.2d 16 (Wis. 2017); *Moe v. Benelli U.S.A. Corp.*, 743 N.W.2d 691 (Wis. 2007); *Ziegler*, 407 N.W.2d 873. We see no reason to think that this litigation will diminish. And because these dealership cases often involve out-of-state sellers and in-state distributors, and the amount in controversy often exceeds $75,000, it is also likely that the federal courts will continue to need the state supreme court's guidance. *E.g. Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 646 F.3d 983 (7th Cir. 2011); *Eisencorp, Inc. v. Rocky Mountain Radar, Inc.*, 398 F.3d 962 (7th Cir. 2005). Finally, the scope of the Fair Dealership Law implicates an important state public policy that is the proper concern of the Wisconsin Supreme Court, not the federal judiciary. See *Doe v. Am. Nat. Red Cross*, 976 F.2d 372, 374 (7th Cir. 1992).

We respectfully ask the Wisconsin Supreme Court to answer the following question:

> Does the definition of a dealership contained in Wis. Stat. § 135.02(3)(b) include wine grantor-dealer relationships?

We invite the Court to reformulate this question and expand its inquiry to the extent it is necessary to resolve this case. The Clerk of this court is instructed to send the full record of the case to the state supreme court for its use in the consideration of this request.

QUESTION CERTIFIED.