LAKEFIELD TELEPHONE COMPANY, a Wisconsin Corporation, Plaintiff–Appellant, Cross–Appellee,

v.

NORTHERN TELECOM, INC., a Delaware Corporation, Defendant–Appellee, Cross–Appellant.

Nos. 88–3062, 88–3140.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1991.

Decided Aug. 7, 1992.

---

John W. Markson, Bell, Metzner, Gierhart & Moore, Madison, Wis. (argued), for plaintiff-appellant.

Clay Williams, Robert E. Wrenn, Terry E. Nilles (argued), Gibbs, Roper, Loots & Williams, Milwaukee, Wis., for defendant-appellee.

Before WOOD, Jr.* and KANNE, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Plaintiff Lakefield Telephone Company claims to be a dealer for defendant Northern Telecom and entitled to the protection of the Wisconsin Fair Dealership Law (WFDL), Wis.Stat. § 135.01 *et seq.* (1989).[1] After a trial, the district court decided that Lakefield was not a "dealer" under WFDL and Lakefield has appealed. Initially the district court had found a likelihood that Lakefield would prevail and had issued a preliminary injunction. The district court also found that defendant had violated it and fined it for contempt. Defendant appealed from that part of the judgment.

Many of the facts are set forth in Judge Warren's opinion, *Lakefield Telephone Co. v. Northern Telecom, Inc.*, 696 F.Supp. 413 (E.D.Wis.1988). The decision granting a preliminary injunction is reported in *Lakefield Telephone Co. v. Northern Telecom, Inc.*, 656 F.Supp. 813 (E.D.Wis.1987).

## LAKEFIELD'S APPEAL

Without restating all the details, we summarize the facts which we consider critical to decision as follows.

Plaintiff Lakefield is an independent telephone company serving a rural part of Manitowoc County, Wisconsin. It has three employees who operate its telephone system, and two whose activities are relevant to this case, one being full-time and one part-time. Defendant Northern Telecom, Inc. (Northern) is a large manufacturer of telephone interconnect systems. An interconnect system links a private branch exchange within a business or institution with a telephone company. A significant third party is Telecom North, Inc. (Telecom). Telecom grew to be a very substantial actor in the telephone interconnect system business. It had attempted to become a dealer for Northern, but Northern rejected it.

Beginning early in 1984, representatives of Telecom discussed with Lakefield the

---

* Judge Wood, Jr. assumed senior status on January 16, 1992 which was after oral argument in this case.

1. Jurisdiction is founded on diversity. Wisconsin law governs the critical substantive issues.

prospect of Lakefield becoming a Northern dealer and, as such, working with Telecom. Lakefield then formed a relationship with Northern in which Northern permitted Lakefield to purchase and resell equipment produced by Northern. Plaintiff also formed a relationship with Telecom, which had about 140 employees. Lakefield had, at most, two employees involved in interconnect system sales effort. Thomas Nass spent 90% of his time in relevant sales and engineering activity, and he had part-time assistance of a clerical employee. Telecom performed most of the sales effort. As Telecom secured orders, Lakefield purchased equipment from Northern to fill them.

Lakefield and Telecom executed a written agreement on July 9, 1984. It was entitled "Exclusive Sales and Marketing Agency Agreement." Judge Warren considered it as essentially making Telecom the real distributor of the products purchased from Northern by Lakefield. He gave it critical significance in deciding that Lakefield did not have the community of interest with Northern which is essential to WFDL dealership status for Lakefield.

Personnel of Northern were aware of Lakefield's use of Telecom and at various times, and in varying degrees, some of them voiced objections. Others did not. The relationship between Northern and Lakefield can be characterized as at least uneasy in this respect. In March, 1986, Northern presented to Lakefield a proposed written distribution agreement similar in form to agreements it proposed to others. It would restrict Lakefield's sales of Northern's products to Lakefield's telephone service area, whereas Lakefield (through Telecom) had sold to customers widely throughout Wisconsin. The agreement would also prohibit use of Telecom. Lakefield rejected the proposal and Northern announced it would no longer fill Lakefield orders.

On May 2, 1986, Lakefield filed an action against Northern in a Wisconsin court. It alleged it had a contract under which it was a dealer and that Northern had violated WFDL by changing competitive circum-stances and refusing to fill orders when Lakefield rejected the change. Northern removed the case to federal district court.

In February, 1988, the case was tried before a jury, which rendered a special verdict. It found there was an agreement wherein Northern granted Lakefield the right to sell Northern products; that the agreement permitted the use of Telecom; that Northern did not have good cause to terminate Lakefield; and awarded $40,000 damages from the date of termination through February 18, 1987, and $20,000 from February 19, 1987 through December 31, 1987. Judge Warren had ruled that the verdict would be advisory on factual issues other than damages, and binding on the latter. Lakefield does not argue that the division is inappropriate. Judge Warren made his own findings.

■ In order to have a dealership protected by WFDL, there must be a contract or agreement between the alleged dealer and alleged grantor giving the dealer the right to sell or distribute goods or services and there must be a community of interest in the business of selling or distributing the goods or services. Wis.Stat. § 135.02(3); *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 763, 300 N.W.2d 63 (1981). Both the jury and Judge Warren found that the contract elements existed. The question of community of interest was not submitted to the jury, and Judge Warren concluded that the agreement with Telecom was a transfer of Lakefield's WFDL protected interest to Telecom, which destroyed the community of interest between Northern and Lakefield.

■ WFDL defines "community of interest" as "a continuing financial interest between the grantor and the grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). The Supreme Court of Wisconsin, however, deemed it necessary, in order to effectuate legislative intent, to broaden the definition of community of interest for the purpose of defining a protected dealership. *Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 607, 407 N.W.2d 873 (1987), *reconsidered on differ-*

*ent grounds,* 147 Wis.2d 308, 433 N.W.2d 8 (1988). "As used in the definition of dealership, the phrase community of interest signifies not only a continuing financial interest, but also a likeness or similarity of interest in the common business in which the dealer and grantor are engaged. Community of interest connotes shared goals and cooperative, coordinated efforts." *Id.* 139 Wis.2d at 604, 407 N.W.2d 873. Treating a "continuing financial interest" as "one guidepost to determine community of interest," the *Ziegler* court decided that "a second guidepost derived from the statutes to determine community of interest may be called 'interdependence,' the degree to which the dealer and grantor cooperate, coordinate their activities and share common goals in their business relationship." *Id.* at 605, 407 N.W.2d 873.

One who claims to be a dealer must "demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel, or not renew a threat to the economic health of the person (thus giving the grantor inherently superior bargaining power). The alleged dealer's economic health is threatened when a termination, cancellation, failure to renew, etc., a business relationship would have a significant economic impact on the alleged dealer." *Id.*

This court, in considering the WFDL, has explained,

We have deduced from the structure and history of the statute a central function—preventing suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand.... This implies that unless a large portion of the business is committed to a supplier, or the reseller has substantial assets specialized to that supplier's goods, there is no opportunity to exploit by changing the terms in mid-stream, no terms other than those applied to all middlemen, hence no "community of interest," and so no statutory "dealership."

*Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418, 419 (7th Cir.1990) (citations omitted).

The *Ziegler* court also noted the "flexibility" of the concept of community of interest which the legislature intended it to have. The court identified ten facets of possible business relationships which courts should consider in evaluating both guideposts, noting that the list is not all inclusive. *Ziegler,* 139 Wis.2d at 606, 407 N.W.2d 873. In a companion case, the court said that application of the WFDL to the facts involves a question of law to be decided without deference to the decisions of lower courts. *Bush v. National School Studies, Inc.,* 139 Wis.2d 635, 646, 407 N.W.2d 883 (1987).

Consideration of the ten *Ziegler* "facets" does not strongly indicate that *Lakefield* was a dealer protected by WFDL.

Facet (1). Lakefield and Northern did not deal with each other for a long period; the relationship continued from February or March 1984 until termination in May, 1986. As already noted, the relationship was uneasy because of the participation of Telecom. The relationship between Lakefield and Northern after termination was compelled by a preliminary injunction.

Facet (2). There was no express contract between Lakefield and Northern, and mutual obligations were at most that Northern would sell its systems to Lakefield and Lakefield would pay Northern for them and see that the ultimate buyers received proper installation and services.

Facet (3). Out of a total of five employees, one, Thomas Nass, devoted 90% of his time to sales, engineering, and service related to Northern's products. One part-time employee did relevant clerical work.

Facet (4). Gross proceeds from Lakefield's telephone business were $500,000 annually. In 1984, Lakefield purchased products from Northern priced at about the same amount; in 1985, at about $1,500,000, and received payment from Telecom of those amounts, plus a commission of a little more than 5%. Treating these amounts as gross proceeds, derived from Northern products, they were 50% of the total in

1984, and 75% of the total in 1985. The net revenue to Lakefield from its dealings in Northern products was ⅙th or ⅐th of its revenue from its telephone system.

Facet (5). Northern granted no territory to Lakefield, although in fact, Lakefield sold only within Wisconsin.

Facet (6). Lakefield seems not to have used Northern's proprietary marks in any significant way.

Facet (7). Judge Warren referred to Lakefield's "total investment" as $220,000, and considered it substantial. That figure, however, represents Lakefield's total expenditures in connection with Northern products up to the time of trial and, in large part, represents business expenses which were offset by its commissions and by compensation for Thomas Nass's engineering and similar services. Ninety percent (90%) of Nass's $40,000 annual salary was included, as well as the compensation of his clerical assistant, automobile expenses, and the like. From 1984 to the time of trial, Lakefield's net revenue from sales was $163,000. After deducting expenses, there was a loss in two years and a profit in one. Lakefield's additional revenue for engineering services was $120,000.

Facet (7) reads: "the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership." *Ziegler*, 139 Wis.2d at 606, 407 N.W.2d 873. *See also Bush*, 139 Wis.2d at 655 n. 9, 407 N.W.2d 883. Our own study of the record indicates a maximum possible investment for those purposes of $66,000, and within that amount an item of equipment which cost $22,000 was purchased at the behest of Telecom.

Facet (8). As already noted, Lakefield devoted one full-time and one part-time employee to the business in connection with Northern products.

Facet (9). Lakefield expenditures for promotion of Northern products was apparently negligible.

Facet (10). Lakefield, as well as Telecom, supplied service to the ultimate purchasers. Lakefield's services were performed by Nass, who spent 90% of his time in connection with Northern's products, and Lakefield was compensated for at least some of his technical efforts.

The circumstances which are peculiar to this case are that the bulk of the performance of the business of buying and selling the alleged grantor's product is carried on by a third party who has no agreement with the alleged grantor, and the alleged dealer has given control of the business of the claimed dealership to the third party. None of the facets listed in *Ziegler* deals with circumstances like these, but the list is not intended to be all inclusive.

Judge Warren considered the Exclusive Sales and Marketing Agency Agreement as an assignment to Telecom of Lakefield's entire right to purchase Northern's products, and found that Lakefield destroyed its community of interest with Northern and removed itself from the protection of the WFDL.

The record shows that Lakefield does not itself have the capacity to carry on the size of dealership operation it is seeking to protect. Thomas Nass testified that he personally could not do all the service work for all customers; that he must rely on Telecom's inventory of parts; that it was Telecom which installed the equipment and was on call 24 hours a day, seven days a week. Nass was asked about an offer by Northern to allow Lakefield to sell in five counties, and he said Lakefield would not be able, acting alone, to do so.

Lakefield refers to Telecom as its "agent" and takes issue with Judge Warren's characterization of the Agreement as a transfer or assignment of its rights. Verbiage aside, examination of the Agreement shows that it is an effective transfer of control of the "dealership" business.

By the Agreement, Lakefield appointed Telecom Lakefield's exclusive marketing agent for Northern's products in Wisconsin and any other state in which Lakefield is authorized to sell. Lakefield is prohibited from appointing any other agent and from supplying the products to anyone else, except certain items within Lakefield's subscriber territory. Telecom shall have exclusive authority over the sale and pro-

motion of the products, including setting prices. When Telecom sends an order to Lakefield, Lakefield shall order the same products from Northern, and shall ship products according to Telecom's instructions. Telecom shall remit to Lakefield Northern's invoice cost plus Lakefield's commission. Telecom is not obligated to sell any minimum nor restricted to any maximum. Lakefield shall provide engineering and technical services as requested and paid for by Telecom. Lakefield is required to remain in good standing with Northern, and if Northern were to terminate Lakefield, Lakefield shall assign its claims against Northern to Telecom, and Telecom may sue in Lakefield's name. The term of the Agreement was five years, renewable for five years in the absence of notice by either party. It could be terminated by either party for breach or misrepresentation, but for five years after termination, regardless of cause, Lakefield agreed not to sell any of the covered products or a competitive product anywhere except that it could sell specified products in its subscriber territory.

Although the Agreement did not expressly "assign" any rights, it left Lakefield having to wait five years after termination before attempting to start business with Northern again, surely a close approximation to assignment of the rights it had when the Agreement was executed.

Once control of the business was transferred to Telecom, Lakefield no longer had a "likeness or similarity of interest in the common business in which the dealer and grantor are engaged." *Ziegler*, 139 Wis.2d at 604, 407 N.W.2d 873. We agree with Judge Warren that Lakefield could no longer show a community of interest with Northern, and also with his thought that the Wisconsin legislature did not intend to protect as a dealer one who transferred to a third party its right to buy and sell a product or service.

## NORTHERN'S APPEAL

 The district court found that Northern had failed to obey the preliminary injunction because it had not responded to inquiries from Telecom. The court fined Northern $2,000. Northern appeals. We will reverse contempt orders only if the district court abused its discretion. *Walaschek & Associates v. Crow*, 733 F.2d 51, 53 (7th Cir.1984).

 The preliminary injunction required Northern "to continue to do business with Lakefield under the terms and conditions of its business relationship as it existed prior to April 22, 1986." The district court found that despite this injunction, Northern "failed to respond to inquiries from Lakefield's agent, Telecom North, to defendant Technical Assistance Center, as defendant did prior to April 22, 1986." 696 F.Supp. at 423.

Northern admits that it refused to deal directly with Telecom, but contends that the preliminary injunction required only that Northern provide technical assistance to Lakefield. Although neither party clearly explains what led to the contempt order, it appears that Northern had provided Telecom employees with technical assistance before the preliminary injunction, but at that time it thought they were Lakefield employees. After Northern realized who was employed by Telecom, it refused to provide technical assistance because on April 12, 1985, Northern had sent Lakefield a letter saying it did not recognize Telecom and would not support Telecom's efforts to install and maintain products.

The district court did not abuse its discretion in holding that the preliminary injunction required Northern to maintain the *status quo* and provide technical assistance to all employees it had previously aided. Whether the terms of the relationship called for assistance to Telecom employees was an issue for trial, not an issue for Northern to resolve for itself. Whatever ambiguity there was in the court's injunction, it should have been clear that by refusing to help those whom it had previously helped, Northern was significantly changing the *status quo*, and the preliminary injunction was entered to maintain the *status quo*.

We AFFIRM the judgment of the district court. Northern may tax costs, except for its cross-appeal.

AFFIRMED.