978 F.2d 395
 FRIEBURG FARM EQUIPMENT, INCORPORATED, a Wisconsin
corporation, Frieburg Farm Equipment, a Wisconsin
partnership, Harold R. Frieburg, et al.,
Plaintiffs-Appellees,
v.
VAN DALE, INCORPORATED, a Minnesota corporation, Defendant-Appellant.
 No. 91-1510.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 19, 1992.
Decided Oct. 29, 1992.
 
 James F. Gebhart, H. Dale Peterson (argued), Stroud, Stroud, Willink, Thompson & Howard, Madison, Wis., for plaintiffs-appellees.
 Edwin J. Hughes (argued), Ted Waskowski, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for defendant-appellant.
 Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 FLAUM, Circuit Judge.
 
 
 1
 Frieburg Farm Equipment, Inc., and related parties (collectively "Frieburg") brought this diversity suit against Van Dale, Inc., under the Wisconsin Fair Dealership Law (WFDL) and state common law. The district court, on cross motions for summary judgment, held that Frieburg met the statutory definition of "dealer," and hence could proceed with its WFDL count. At the same time, the court granted Van Dale summary judgment on all other counts, save one for breach of contract. Frieburg Farm Equip., Inc. v. Van Dale, Inc., No. 89-C-0666-C (W.D.Wis. Sept. 6, 1990) ("Frieburg I "). The case went to trial, and the jury found for Frieburg on both the WFDL and contract counts, awarding it $133,915 and $31,357 in damages, respectively. The district court then granted Frieburg approximately $150,000 in fees and costs to which it was entitled under the WFDL, and denied all of Van Dale's post-trial motions. Frieburg Farm Equip., Inc. v. Van Dale, Inc., 756 F.Supp. 1191 (W.D.Wis.1991) ("Frieburg II "). Van Dale raises a number of issues on appeal, and we affirm.
 
 I.
 
 2
 Frieburg is a retail business engaged in the sale, service and installation of farm equipment. Van Dale manufactures and sells farm equipment to retail dealers. For some time, Hedlund Farm Systems, located in Boyceville, Wisconsin, served as Van Dale's dealer in St. Croix and Dunn counties, but it went out of business in late 1985. Shortly thereafter, Van Dale offered Frieburg, which was already established as a farm equipment outlet in nearby Glenwood City, the opportunity to take over Hedlund's territory, and Frieburg accepted. It signed a Van Dale dealership agreement in March 1986, and, as part of the bargain, purchased Hedlund's assets, paying approximately $25,000 for inventory and $20,000 for various fixed assets, including five trucks. Frieburg claims, and the jury found, that Van Dale promised Frieburg that it would serve as Van Dale's exclusive dealer in St. Croix and Dunn counties.
 
 
 3
 Initially, Frieburg operated its Van Dale dealership out of two locations: its original premises in Glenwood City, and the former Hedlund store in Boyceville, which Frieburg leased from the Hedlund family. In late 1986, Frieburg informed Van Dale that it wished to close the Boyceville location and consolidate its operations in Glenwood City. Van Dale objected, and threatened to appoint another dealer in Dunn county if Frieburg carried out its plan. Frieburg acceded, and in November 1986 it sold the Glenwood City property and purchased the Boyceville property from the Hedlunds for $30,000. Just three months later, despite Frieburg's compliance with its demands, Van Dale appointed another dealer in Dunn county. It had also appointed two other dealers in St. Croix county the previous May.
 
 
 4
 In response, Frieburg brought this suit against Van Dale in July 1989. On January 2, 1990, Van Dale notified Frieburg that it planned to terminate the dealership owing to Frieburg's past due account, history of late payments, and poor sales volume. Van Dale told Frieburg that it could retain the dealership only if it paid off its account balance, maintained a current account for sixty days, and purchased $40,000 worth of Van Dale equipment during January and February. Frieburg put its account in order, but did not make the requisite purchases, and Van Dale terminated the dealership in April 1990. Frieburg amended its complaint, and the suit proceeded as described above.
 
 II.
 A.
 
 5
 The WFDL protects dealers by prohibiting grantors from terminating dealerships without good cause. Wis.Stat. § 135.03. The statute reaches only to those business relationships properly classified as "dealerships," a term of art defined under the WFDL as (1) a contract, either express or implied, (2) by which the dealer is granted the right to sell or distribute goods or services, or use a trade name, trademark or the like, and (3) in which there is a "community of interest." Id. § 135.02(3); Pollack v. Calimag, 157 Wis.2d 222, 458 N.W.2d 591, 596 (Wis.App.1990).
 
 
 6
 On summary judgment, the district court held that Frieburg was a dealer under the WFDL. Frieburg I, slip op. at 10-19. Van Dale challenges that ruling; it acknowledges that its relationship with Frieburg satisfied the first and second dealership criteria, but contends that the two businesses did not share a community of interest. Van Dale does not argue that the court should have left the community of interest issue to the jury; the parties agree--although the commentators have their doubts, see Michael A. Bowen & Brian E. Butler, The Wisconsin Fair Dealership Law § 3.3, at 3-[1-2] (Supp.1991)--that the issue presents a question of law for the court. Given this, we draw from the undisputed facts, the trial record and the jury's verdict in deciding for ourselves whether Frieburg and Van Dale shared a community of interest. Bush v. National School Studios, Inc., 139 Wis.2d 635, 407 N.W.2d 883, 888 (1987) (question of whether a business is a "dealer" subject to de novo review).
 
 
 7
 The WFDL defines "community of interest" as "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." Wis.Stat. § 135.02(1). We have in the past disparaged this definition as vague and unhelpful, see, e.g., Moodie v. School Book Fairs, Inc., 889 F.2d 739, 744 (7th Cir.1989); Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc., 846 F.2d 1095, 1096 (7th Cir.1988), for it permits no ready way in which to differentiate a dealership from any ordinary vendor/vendee relationship. Bush, 407 N.W.2d at 888. The Wisconsin Supreme Court recently illuminated matters somewhat by establishing two "guideposts" that serve to distinguish communities of interest. See Ziegler Company, Inc. v. Rexnord, Inc., 139 Wis.2d 593, 407 N.W.2d 873 (1987) ("Ziegler I "), on reconsideration, 147 Wis.2d 308, 433 N.W.2d 8 (1988) ("Ziegler II "). The first guidepost is the dealer's and grantor's "continuing financial interest" in their business relationship; a dealer can manifest such an interest by, among other things, investing in grantor-specific inventory and facilities. Id. 407 N.W.2d at 880. The second guidepost is "interdependence," which the Court described as "shared goals and a cooperative effort more significant than in the typical vendor-vendee relationship." Id. 407 N.W.2d at 879; see also Pollack, 458 N.W.2d at 596. To shed further light upon the two guideposts, Ziegler I sets out a non-exclusive list of ten factors, all of which deal with various aspects of the alleged grantor-dealer relationship. Ziegler I, 407 N.W.2d at 879-80.[1] Significantly, the Court explicitly rejected an approach that would have required a business, to qualify as a "dealer," to have garnered a certain minimum percentage of its revenues from servicing or selling the grantor's products. Id. at 878; see also Bush, 407 N.W.2d at 890 (courts should not "focus solely on the telltale trappings of the traditional franchise"). At the same time, the Court observed that a "low percentage," such as 8%, is strong evidence that there was no community of interest, at least absent other indicia, such as a dealer's investment in the dealership. Ziegler I, 407 N.W.2d at 880.
 
 
 8
 It is plain that the Wisconsin courts have created a totality of the circumstances test. Id. at 879; Moodie, 889 F.2d at 744. Our cases have distilled the principles underlying the Wisconsin cases, and provide that a community of interest may exist under one of two circumstances: first, when a large proportion of an alleged dealer's revenues are derived from the dealership, and, second, when the alleged dealer has made sizable investments (in, for example, fixed assets, inventory, advertising, training) specialized in some way to the grantor's goods or services, and hence not fully recoverable upon termination. Lakefield Tel. Co. v. Northern Telecom, Inc., 970 F.2d 386, 389 (7th Cir.1992); Kenosha Liquor Co. v. Heublein, Inc., 895 F.2d 418, 419 (7th Cir.1990); Moodie, 889 F.2d at 744; Fleet Wholesale, 846 F.2d at 1097; Moore v. Tandy Corp., 819 F.2d 820, 822 (7th Cir.1987). We also suppose that some combination of revenues and investments could manifest a community of interest, even if neither could standing alone. See Ziegler I, 407 N.W.2d at 879-82; Kealy Pharmacy & Home Care Servs., Inc. v. Walgreen Co., 761 F.2d 345, 349-50 (7th Cir.1985).
 
 
 9
 Some have opined that federal diversity courts impose stricter requirements upon alleged dealers than do Wisconsin state courts, see Bowen & Butler, supra, § 3.34, at 3- (Supp.1991), but we do not believe this to be the case. Both federal and state courts rest their decisions upon identical principles. Wisconsin courts have recognized that a dealership exists only if the alleged dealer's stake in the relationship is so significant that termination would have severe economic consequences. Ziegler I, 407 N.W.2d at 879. We have recognized the same tenet, albeit in a slightly different manner: a retailer is a dealer only if it has made the kind of investments that would tempt an unscrupulous grantor to engage in opportunistic behavior--in other words, to exploit the fear of termination that naturally attends a dealer's investment in grantor-specific assets. Kenosha Liquor, 895 F.2d at 419; Moodie, 889 F.2d at 742; Moore, 819 F.2d at 822-23. At root, these are two ways of saying the same thing. A grantor can exploit a dealer's fear of termination (our words) only if termination will have severe economic consequences (their words). Severe economic consequences will attend termination (theirs) because the dealer will be unable to recover its sunk costs (ours). The ten Ziegler I factors structure any inquiry into these matters.
 
 
 10
 Here, the business relationship between Frieburg and Van Dale exhibited several attributes of a dealership. See note 1 supra (listing attributes). Van Dale, as the jury's verdict confirmed, granted Frieburg an exclusive dealership in St. Croix and Dunn counties. Frieburg invested $70,000 in the dealership--a large proportion of which, as we shall see shortly, was specialized to Van Dale--and consolidated its premises in Boyceville rather than Glenwood City at Van Dale's behest. A fairly significant share of Frieburg's revenues--how significant we shall also see--was derived from selling and servicing Van Dale equipment. Frieburg participated in Van Dale's cooperative advertising program, promoted Van Dale products in advertisements and at fairs and trade shows, and sponsored open houses featuring Van Dale products. Frieburg serviced, installed and provided warranty labor for Van Dale equipment. It used the Van Dale trade name and logo on its stationary, bank checks, business cards, brochures, and in the telephone directory. Van Dale enforced at least some of the provisions contained in its dealer policy guide. Accordingly, we agree with the district court that the various facets of Frieburg's relationship with Van Dale, considered "individually and in their totality," manifest a "continuing financial interest" and "interdependence" sufficient to constitute a dealership under the WFDL. Ziegler I, 407 N.W.2d at 879; see also Moodie, 889 F.2d at 744-45.
 
 
 11
 Van Dale disputes this characterization on a number of grounds, only two of which warrant our attention. The first concerns the percentage of Frieburg's business that was attributable to selling and servicing Van Dale products. Van Dale contends that between 1986 and 1989, the proportion of Frieburg's revenues derived from the sale of Van Dale products declined from 29.5% to 11.8%, and that during that time Frieburg increased retail sales, and hence its own purchases, of other manufacturers' products. Frieburg claims that Van Dale's statistics, which are based solely upon retail sales, are deceptively low, and that taking into account service and repair revenues jacks up the numbers to 43% and 28%, respectively. Based on our independent review of the record, the truth seems to fall somewhere in between, but where exactly between 11% and 28% it falls is not significant. Even a proportion as low as 11% can suffice if a relationship exhibits, as here, other characteristics of a community of interest. See Ziegler I, 407 N.W.2d at 880 (1%-8% sufficient); Kealy Pharmacy, 761 F.2d at 349-50 & n. 6 (6%-8% sufficient); cf. Kenosha Liquor, 895 F.2d at 420 (8% not sufficient absent any other Ziegler I factors, particularly investment in firm-specific assets); Fleet Wholesale Supply, 846 F.2d at 1097-98 (0.5% not sufficient under similar circumstances).
 
 
 12
 Also significant are the particular circumstances underlying the decline in Frieburg's Van Dale-related business. As noted, Van Dale breached its promise to Frieburg by appointing three other dealers in Dunn and St. Croix counties in 1986 and 1987. Evidence at trial attributed part of the sales decline to Van Dale's introduction of these competitors in what was to have been Frieburg's exclusive territory. Permitting a grantor to breach a promise of exclusivity, and then to claim that the grantee, because of the resulting decline in sales, no longer satisfies the statutory definition of "dealer," would subvert the goals underlying the WFDL. See Wis.Stat. § 135.025(2); Bush, 407 N.W.2d at 888-90. A decline in the proportion of revenues related to the grantor's products may expunge a once-existing community of interest, see Midwest Perishables, Inc. v. Jack Frost, Inc., [New Developments] Bus. Franchise Guide (CCH) p 9467 (W.D.Wis. Aug. 25, 1989) (decrease from 26% to 9.8%), but not if the grantor was largely responsible for the decline.
 
 
 13
 Van Dale's second major contention regards the nature of Frieburg's investments in the dealership. It maintains that most of Frieburg's $70,000 investment was either recoverable (e.g., the inventory Van Dale repurchased after termination) or adaptable to other uses (e.g., the Boyceville property and the five trucks) after termination. Frieburg, it follows, did not make the sorts of grantor-specific investments necessary to bring about a community of interest under the WFDL. See Kenosha Liquor, 895 F.2d at 419-20 (emphasizing importance of investments tied to grantor's products and worth less in another use); Moodie, 889 F.2d at 742 (same).
 
 
 14
 Although Van Dale correctly states the law, the premise underlying its argument--that Frieburg did not make Van Dale-specific investments--is questionable. Consider Frieburg's purchase of the Boyceville property from the Hedlunds. This investment was specialized to the Van Dale dealership, not owing to the specialized nature of the property's fixtures or physical plant (as is the case, say, with a McDonald's franchise), but for a more subtle, yet no less viable, reason. Frieburg initially sought to consolidate its business in Glenwood City, but ultimately moved to Boyceville at Van Dale's insistence. Frieburg presumably believed that its business would prosper to a greater extent in Glenwood City, while Van Dale believed that its interests would be best served by maintaining a significant presence in Boyceville. As such, Frieburg's move constituted a significant investment by Frieburg--the sacrifice of its preferred location and the attendant opportunity costs--in tailoring its business around the Van Dale dealership. See Kenosha Liquor, 895 F.2d at 419. Frieburg vacated Glenwood City and consolidated in Boyceville on the strength of its status as a Van Dale dealership; this exposed it to the threat of opportunistic behavior by Van Dale, which could then have threatened to leave Frieburg in the lurch by terminating the relationship or adding new dealers. See Moore, 819 F.2d at 822-23. Accordingly, Frieburg did make grantor-specific investments in the dealership that could not be readily recovered upon termination of its Van Dale dealership: it is now stuck in Boyceville, when it would rather have been in Glenwood City.
 
 
 15
 Based on our examination of the nature of Frieburg's business relationship with Van Dale, we conclude that the district court correctly found the existence of a dealership under the WFDL.
 
 B.
 
 16
 We turn to the issue of liability. Frieburg's status as a "dealer" does not necessarily insulate it from termination, because the WFDL permits grantors to terminate dealers for good cause. Wis.Stat. § 135.03. One can establish good cause by demonstrating that a dealer failed to comply with "essential and reasonable" and "non-discriminatory" requirements imposed by the grantor. Id. § 135.02(4)(a); Deutchland Enter. Ltd. v. Burger King Corp., 957 F.2d 449, 452 (7th Cir.1992); Remus v. Amoco Oil Co., 794 F.2d 1238, 1240 (7th Cir.), cert. dismissed, 479 U.S. 925, 107 S.Ct. 333, 93 L.Ed.2d 345 (1986). Whether a grantor had good cause is a question of fact for the jury. Ziegler Co., Inc. v. Rexnord, Inc., 147 Wis.2d 308, 433 N.W.2d 8, 13 (1988) ("Ziegler II "); White Hen Pantry v. Johnson, 599 F.Supp. 718, 719 (E.D.Wis.1984). While Van Dale correctly observes a court may take this issue away from the jury if a reasonable person could arrive at only one conclusion, see, e.g., Deutchland Enter., supra; Remus, supra, as a general matter "only the trier of fact can determine what was essential, reasonable and nondiscriminatory" under the circumstances. Ziegler II, 433 N.W.2d at 13.
 
 
 17
 Here, the district court submitted the issue of good cause to the jury, which determined that Van Dale had not satisfied its burden. Van Dale contends that it was entitled to judgment as a matter of law, pointing to Frieburg's failure to meet established sales goals, and the greater than 40% decline in Frieburg's annual purchases of Van Dale products during the course of the dealership. Van Dale also alleges that Frieburg progressively shifted a large portion of its retail business from Van Dale to competing manufacturers.
 
 
 18
 Van Dale's arguments have some merit, but do not carry the day. Admittedly, a dealer's deficient sales and purchasing performance can constitute good cause for termination, see, e.g., Al Bishop Agency, Inc. v. Lithonia, 474 F.Supp. 828, 833-34 (E.D.Wis.1979), and a jury verdict holding that Van Dale properly terminated Frieburg would not have been unreasonable. See Frieburg I, slip op. at 25 (denying Frieburg summary judgment on good cause issue). But in this case, the evidence on the good cause issue was far from conclusive, and consequently sufficient to support a verdict for Frieburg. To take one example, Van Dale introduced evidence at trial that Frieburg had purchased all of its barn cleaner chain from a J & D, a competitor of Van Dale. Frieburg rebutted this charge with evidence that Van Dale knew Frieburg was a J & D dealer when it granted Frieburg a dealership back in 1986, that J & D chain was superior to Van Dale chain in terms of quality and price, and further that Van Dale had been unable to fill Frieburg's orders for chain. Faced with this evidence, a reasonable jury could have found that, given the circumstances, Frieburg's actions did not justify termination. The same holds for Van Dale's allegations at trial regarding Frieburg's declining sales performance. Frieburg conceded that its Van Dale-related sales had dropped, but explained, with an expert's assistance, that the decline was due in large part to Van Dale's appointment of three other dealers in Dunn and St. Croix counties. In this light, the jury's verdict that Van Dale lacked good cause to terminate Frieburg was reasonable, and the district court did not err in declining to decide the issue as a matter of law.
 
 C.
 
 19
 Finally, we consider remedies. The district court held a bifurcated trial, and Van Dale, at the conclusion of the liability phase, offered to comply with an injunction restoring Frieburg's dealership. Frieburg refused the offer, and instead sought to recover damages for lost past and future profits. The jury awarded Frieburg $133,915 of the $417,000 for which it asked.
 
 
 20
 Van Dale challenges this award on the ground that the district court should not have submitted the issue of remedies to the jury. It contends that Frieburg may not recover any damages under the WFDL because it refused to mitigate by accepting reinstatement as a Van Dale dealer. In support, Van Dale advances the legal proposition that "a terminated dealer's duty to mitigate its damages requires it to accept an injunction restoring its dealership status if there are no substantial impediments to its doing so." Def.'s Br. at 37. Because there were no substantial impediments here, it continues, the court erred as a matter of law by permitting the jury to award damages.
 
 
 21
 Van Dale, in effect, asks us to recognize a presumption in favor of injunctive relief and against damages for lost future profits. But as a general matter injunctive relief is the exception, and damages the rule. Walgreen Co. v. Sara Creek Property Co., B.V., 966 F.2d 273, 275 (7th Cir.1992); United States v. Rural Elec. Convenience Coop. Co., 922 F.2d 429, 432-33 (7th Cir.1991). There are of course instances when a statute (or the common law) will reverse the traditional presumption, but the WFDL is not one of those statutes. The section on remedies provides that dealers may seek damages, injunctive relief or both. Wis.Stat. § 135.06.[2] The plain meaning of the statute places the choice in the hands of the dealer. Although one federal case appears to have established the presumption Van Dale champions, see Wilburn v. Jack Cartwright, Inc., 514 F.Supp. 493, 499 (E.D.Wis.1981) ("[a] wronged dealer should recover an award of future lost profits only in the most egregious case"), rev'd on other grounds, 676 F.2d 698 (7th Cir.) (unpublished order), on remand, 543 F.Supp. 174 (E.D.Wis.1982), rev'd, 719 F.2d 262 (7th Cir.1983), we do not see how such a presumption follows from the statute. Nor does it follow from the Wisconsin cases considering remedies under the WFDL, which have held, without any fanfare, that damages are normally available to wronged dealers. See Bush v. National School Studios, Inc., 131 Wis.2d 435, 389 N.W.2d 49, 53 (Wis.App.1986), aff'd on other grounds, 139 Wis.2d 635, 407 N.W.2d 883 (1987); Lindevig v. Dairy Equip. Co., 150 Wis.2d 731, 442 N.W.2d 504, 507-08 (Wis.App.1989) (recognizing availability of damages, but denying recovery on evidentiary grounds); see also Lakefield Tel. Co. v. Northern Telecom Inc., 679 F.Supp. 881, 883 (E.D.Wis.) (directing alleged dealer to elect either injunction or damages prior to trial), dismissed on other grounds, 696 F.Supp. 413 (E.D.Wis.1988), aff'd, 970 F.2d 386 (7th Cir.1992).
 
 
 22
 Van Dale sidesteps the plain language of § 135.06, as well as the state cases recognizing the availability of damages, and points instead to the general duty to mitigate damages imposed under Wisconsin law. See Kuhlman, Inc. v. G. Heileman Brewing Co., Inc., 83 Wis.2d 749, 266 N.W.2d 382, 384 (1978). This duty, however, does not support a presumption that dealers must accept equitable relief under the WFDL. Wisconsin requires mitigation, but not if a reasonable person would decline to undertake the "effort, risk, sacrifice or expense" involved. Id. Whether an injured person acted reasonably to mitigate damages is a question of fact for the jury, id. 266 N.W.2d at 385; Lobermeier v. General Tel. Co., 119 Wis.2d 129, 349 N.W.2d 466, 474 (1984), except where it is possible to reach only one reasonable conclusion.
 
 
 23
 We find that the district court correctly submitted the question of mitigation to the jury. Van Dale argued during the damages phase of the trial that Frieburg could have mitigated its damages by accepting reinstatement, and the court instructed the jury that Frieburg was bound to take reasonable steps in mitigation. The jury apparently believed that it was unreasonable to expect Frieburg to accept Van Dale's offer of reinstatement. Successful dealerships require close cooperation between dealer and grantor. Given the evidence introduced at trial--including Van Dale's claims that Frieburg was its worst dealer in Wisconsin, its appointment of other dealers in Van Dale's territory, and the apparent animosity between the parties--the jury was entitled, though not compelled, to conclude that the relationship between Frieburg and Van Dale had been irreparably damaged, and that it was best for the two to go their separate ways.
 
 
 24
 * * * * * *
 
 
 25
 Van Dale also challenges the sufficiency of the evidence supporting the jury's verdict in favor of Frieburg on the breach of contract count. On the record before us, this challenge constitutes a further effort to second-guess a reasonable verdict rendered by the jury, and as such warrants no separate discussion.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 The ten factors are:
 how long the parties have dealt with each other; the extent and nature of the obligations imposed on the parties in the contract or agreement between them; what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; what percentage of the gross proceeds or profits of the alleged dealer derives from the alleged grantor's products or services; the extent and nature of the alleged grantor's grant of territory to the alleged dealer; the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; the personnel which the alleged dealer devotes to the alleged dealership; how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services.
 Id. 407 N.W.2d at 879-80.
 
 
 [2]
 The statute reads:
 If any grantor violates [the WFDL], a dealer may bring an action against such grantor ... for damages sustained by him as a consequence of the grantor's violation, together with the actual costs of the action, including reasonable attorney fees, and the dealer also may be granted injunctive relief against unlawful termination, cancellation, nonrenewal or substantial change of competitive circumstance.
 Wis.Stat. § 135.06.