**SUPER NATURAL DISTRIBUTORS, INC., Plaintiff,**

v.

**MUSCLETECH RESEARCH AND DEVELOPMENT, Defendant.**

No. 00-C-1361.

United States District Court, E.D. Wisconsin.

Feb. 6, 2001.

Michael A. Bowen—Foley & Lardner, Milwaukee, for Plaintiff or Petitioner.

Kathleen S. Donius—Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Howard Shine—Kenyon & Kenyon—New York, NY, for Defendant or Respondent.

## ORDER

STADTMUELLER, Chief Judge.

Defendant MuscleTech Research and Development ["MuscleTech"] is a Canadian manufacturer of a popular line of dietary supplements. Plaintiff Super Natural Distributors, Inc. ["Super Natural"] is a national distributor of health products, including those of MuscleTech, whose physical plant is located in Waukesha, Wisconsin. This case arises out of MuscleTech's termination of Super Natural's distributorship after learning that Super Natural had obtained nearly $1 million worth of possibly counterfeit MuscleTech product from a mysterious off-shore supplier recommended by a former MuscleTech employee currently under indictment for fraud. Super Natural claims that the termination was improper under the Wisconsin Fair Dealership Law ["WFDL"] because the termination notice did not set out all the reasons for termination and did not offer a realistic opportunity to cure. MuscleTech claims that the MuscleTech—Super Natural relationship was not a "dealership" and that therefore Super Natural is not entitled to the protections of the WFDL. It then argues that even if the WFDL does apply, Super Natural's behavior was so egregious so as to be "uncurable" and so "dirtied Super Natural's hands" that it should be barred from seeking equitable relief in federal court. Super Natural is currently before the court seeking a preliminary injunction to force MuscleTech to continue supplying it with product during the pendency of this lawsuit.

## BACKGROUND

Super Natural is a relatively large operation. In the year 2000, its sixteenth year of existence, it sold well over $20 million worth of product[1] to 1400 different retailers nationwide. Although Super Natural distributes the products of more than 200 vendors, it generated roughly 20% of its revenue last year from sales of MuscleTech-branded product. This was a sharp increase over the previous year, when MuscleTech accounted for only 8.7% of Super Natural's sales. In the other two years of the non-contractual MuscleTech—Super Natural relationship, the shares of revenue derived from MuscleTech product were 6.42 % (1998) and 0.85 % (1997). Super Natural attributes the annual increases, especially the increase from 1999 to 2000, to its increased investments and sales efforts dedicated to the MuscleTech brand. MuscleTech attributes the gains to its own increased advertising, to its expansion of the product line, to a more than 50% decrease in the number of authorized MuscleTech distributors, and, most significantly, to Super Natural obtaining unauthorized, possibly counterfeited, products, which it could sell at below-market prices. MuscleTech points out that "MuscleTech" product actually obtained from MuscleTech only accounted for 13% of Super Natural's revenues last year. The other 7% came from a supplier named "M Olympus" (discussed below).

In support of her position that Super Natural's efforts led to most of the sales increases, Super Natural president Patricia Calvy notes that in the summer of 2000, Super Natural leased a larger warehouse than it had previously occupied. This warehouse costs $21,000 a month in rent, as opposed to the $9,000 per month it previously paid. Ms. Calvy says Muscle-

---

1. Through the first three quarters of 2000 Super Natural's sales were $18.33 million. Figures for the rest of the year have not been presented to the court, though sales undoubtedly surpassed $20 million by a hefty margin.

Tech pressured her into leasing this larger space by instituting a $100,000 per month order minimum for distributors wishing to receive the company's largest discounts. MuscleTech disputes that *it* forced Super Natural to increase capacity, noting that Super Natural's overall sales have increased more than 100% in the past two years and that only 1/28th of the new warehouse's floor space is actually dedicated to MuscleTech product.[2] MuscleTech suggests that increased demand for bulky products from two other manufacturers played an as large, if not larger, role in the decision to move. Super Natural reportedly has hired eight additional employees to work in the new warehouse.

Ms. Calvy also claims that she purchased a $40,000 portable trade show booth largely in order to promote Muscle-Tech products. MuscleTech has provided the court with pictures that show Muscle-Tech is but one of many vendors whose products are featured in the Super Natural booth, however.

On June 29, 2000, MuscleTech informed Ms. Calvy that Kent Mosur, a MuscleTech employee she had done business with, had been fired for suspected counterfeiting of MuscleTech products. Mr. Mosur had been Super Natural's regular contact at MuscleTech until January 2000. At that time, he was promoted from assistant wholesale manager to international sales manager. In late 1999, before Mr. Mosur's promotion, Ms. Calvy contacted Mr. Mosur to complain that another distributor, Costello's, was receiving lower prices than she. Mr. Mosur reportedly suggested that she could obtain even lower prices from a Spanish distributor named M Olympus. She claims she believed M Olympus to be an authorized MuscleTech distributor who could offer lower prices because MuscleTech had a different pric-

ing scheme for Europe than it did for America. While she felt uncomfortable about buying on the grey market, nothing in her informal "contract"[3] with Muscle-Tech prevented her from doing so, and she did, in fact, buy substantial quantities of goods from the purportedly Spanish outfit. MuscleTech has since alleged that M Olympus was not an authorized distributor, but rather was a thinly-disguised front for Mr. Mosur himself, who was selling counterfeit goods manufactured in Florida and shipped from warehouses in New York. While MuscleTech has yet to produce any physical evidence that the "MuscleTech" goods Super Natural obtained from M Olympus were counterfeit, Ms. Calvy has admitted that she believed some other goods supplied by M Olympus—purported "Cytodyne" products—were, indeed, counterfeit.

In any case, on September 18, 2000, MuscleTech informed Ms. Calvy that the FBI was investigating the counterfeiting of MuscleTech product. The company asked for Ms. Calvy's records related to its dealings with M Olympus. She provided many such records to the company. In spite of her apparent cooperation, on October 2, 2000, an expected delivery of MuscleTech product to Super Natural failed to arrive. Ms. Calvy was told that the delay was due to a credit limit problem. Shortly thereafter, Ms. Calvy wired MuscleTech $147,000 to cover a separate invoice that was not yet due. The merchandise still did not arrive, however, despite the fact Super Natural was well below its credit limit. On October 12, 2000, MuscleTech informed Ms. Calvy that it would not be shipping the order because it suspected Super Natural of collaborating with Mr. Mosur in making and distributing counterfeit Mus-cleTech products. She was told that all further shipments would be suspended

---

**2.** This 1/28th number was advanced by MuscleTech executive vice president Terry Begley during the course of the preliminary injunction hearing. When the court asked Ms. Calvy what percentage of the floorspace was actually dedicated to MuscleTech, she responded that she did not know.

**3.** The two parties never had a written agreement.

pending investigation. The very next day, Super Natural instituted this lawsuit in Waukesha County Circuit Court in an effort to ensure future deliveries of Muscle-Tech products.

MuscleTech, for its part, immediately removed to this court. The companies then agreed temporarily to resume shipments, subject to MuscleTech's intent to send a written termination notice. On October 25, 2000, the anticipated termination notice did arrive. This notice indicated termination would occur in sixty days[4] and was based on 1) Super Natural's alleged participation in a counterfeiting ring, 2) Super Natural's failure to follow MuscleTech's directives, 3) misrepresentations about Super Natural's purchase of "counterfeit" products, 4) Super Natural's "poor payment history," and 5) Super Natural's withholding of information related to its purchase of goods from M Olympus. The only opportunity to cure offered was that if Super Natural could "restore MuscleTech's trust" in sixty days, termination would be rescinded. Super Natural vehemently denies that it ever sold counterfeited products, misrepresented facts to MuscleTech, regularly fell behind in its payments, or did anything else to warrant termination. It further asserts that the opportunity to cure offered was chimerical.

In her testimony in a November 27, 2000 deposition and in open court at the preliminary injunction hearing on January 17, 2001, Ms. Calvy claimed that if her access to MuscleTech products is interrupted, Super Natural's cash flow will decrease by up to 20%, that it will sustain losses from overcapacity in its warehouse, and that the resulting shortfalls will force the release of up to ten of its forty employees. Muscle-Tech's witnesses counter that Super Natural's warehouse lease is terminable and sublettable. They further note that the

assertion layoffs would be required is purely conclusory. Ms. Calvy also claims that her investments in goodwill on behalf of MuscleTech, partially in the form of trade show attendance and other advertising directed at retailers, would be lost were Super Natural to lose the Muscle-Tech account. She admits, however, that Super Natural has undertaken almost no MuscleTech-specific merchandising,[5] but rather has promoted its full lime of products (from 200 different vendors) in its promotional activities.

## DISCUSSION

### I. Standard of Review

The purpose of a preliminary injunction is to minimize irreversible harm to both parties during the pendency of a lawsuit. *See Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 388 (7th Cir.1984). Before entering a preliminary injunction, a court must determine 1) that the movant has "no adequate remedy at law" and will suffer irreparable harm if the injunction is not granted, 2) that if the non-movant will suffer irreparable harm if the injunction is granted, that the balance of harms weighs in the movant's favor, 3) that the movant has "some liklihood" of succeeding on the merits, and 4) that the public interest will not be harmed by the imposition of an injunction. *See id.* at 386–88; *Meridian Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1114 (7th Cir.1997). "If the plaintiff does show some likelihood of success, the court must then determine how likely that success is, because this affects the balance of harms. The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland*, 749 F.2d at 387. *See also, Vencor,*

---

**4.** MuscleTech has since agreed to stay termination until this court rules on Super Natural's motion for a preliminary injunction.

**5.** On two occasions, Super Natural ran MuscleTech-specific promotions whereby the retailer who submitted a photograph of the best MuscleTech display would receive a prize.

*Inc. v. Webb,* 33 F.3d 840, 845 (7th Cir. 1994).

## II. Adequate Remedy/Irreparable Harm

MuscleTech claims that Super Natural's primary loss, should an injunction be denied, is loss of sales, which can be compensated at law by a money judgment. *See Price Eng'g. Co., Inc. v. Vickers, Inc.,* 774 F.Supp. 1160 (E.D.Wis.1991). Super Natural, however, asserts that it will lose not only money if it were to lose the Muscle-Tech account, but employees, whose unique contributions to the company can not adequately be compensated by money damages. Furthermore, it claims that even if its losses *were* only monetary, that those losses would be difficult to calculate due to the dynamic nature of the market for MuscleTech products and the uncertain results of its recent investment in its portable trade show booth. The Seventh Circuit Court of Appeals has recognized that in many situations the loss of difficulty-calculated profits can, indeed, qualify as irreparable harm for which there is no adequate remedy at law. *See Roland,* 749 F.2d at 386. Considering the compound nature of the potential loss (that is, both money and personnel), as well as the probable difficulties in putting a monetary figure on that potential loss, the court determines that Super Natural has met the first requirement for a preliminary injunction.

## III. Balance of Irreparable Harms

The harms that will flow to Super Natural if its request for an injunction is denied are obvious—it will lose one of its best-selling brands,[6] it may have to lay off employees, it will lose profitability at least in the short run due to overcapacity at its warehouse, and it may even lose customers as retailers who like to purchase all their nutritional supplements from one source may look elsewhere once Super Natural

becomes unable to provide MuscleTech products. As the court is to look only to "irreparable" harms, however, it is unclear what, if any, weight ought to be given these harms. In *Roland Machinery Company v. Dresser Industries, Inc.,* the Seventh Circuit refused to give much weight to the potential loss of 24% of a company's revenues, noting that "the loss ... will be painful, but it will not be fatal." 749 F.2d at 391. Then, in *Sieren v. William R. Hague, Inc.,* 999 F.Supp. 1244, 1246 (E.D.Wis.1998), this court declined to consider "conclusory" allegations that a plaintiff would lose employees. Similarly, in *Kenosha Liquor Co. v. Heublein, Inc.,* 895 F.2d 418 (7th Cir.1990), the Seventh Circuit rejected equally conclusory allegations that a plaintiff would lose customers if it could not offer a popular brand. As Super Natural has not presented the testimony of an accountant or other qualified individual stating that the company will suffer dangerous losses or will be forced to shed employees if the injunction is not granted, nor evidence that even one customer will look elsewhere if MuscleTech is not included in its list of offerings, the court is hard-pressed to place great weight in the plaintiff's side of the balance.

■ On the other hand, it is not immediately clear that MuscleTech will suffer *any* real harms at all if the injunction is granted. After all, it will continue to generate significant revenues if the distributorship is continued—over $100,000 per month if Super Natural continues to meet its sales goals. The courts, however, have recognized that to "be frozen into an intimate and continuous relationship with a dealer it no longer wishes to be associated with ... is a great hardship." *Roland,* 749 F.2d at 392 (quoting *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 764 (2nd Cir.1979)). Indeed, the loss of the ability to make basic business decisions such as to whom to sell is an

---

6. In 1999, more than 18% of Super Natural's total purchases were from Twin Labs, a competitor of MuscleTech. In 2000, it appears that MuscleTech edged out Twin Labs as Super Natural's best-selling brand, though it is doubtful it would have done so were Super Natural's purchases from M Olympus excluded.

*irreparable* harm. *See id.* MuscleTech has further asserted that it will lose credibility with its other distributors if it is not able to punish one of their members for acting against the interests of the company (even if only by securing goods from an unauthorized source). This, too, is probably an irreparable harm. *Cf. Roland,* 749 F.2d at 391 (noting that a manufacturer's loss of goodwill is an irreparable harm). Thus, the court determines that the balance of irreparable harms is roughly equal. *Cf. id.* at 392 (finding "no clear balance of hardships" in a similar termination of distributorship situation). As such, Super Natural will have to show a "more than likely than not" chance of success on the merits before the court may issue an injunction. *Id.*

## IV. Likelihood of Success

The Wisconsin Fair Dealership Law protects "dealerships" from termination in certain instances. Super Natural claims that it was a MuscleTech "dealer" and that it was improperly terminated (or, rather, is in the process of being improperly terminated) because it was offered no realistic opportunity to cure its alleged misdeeds, as the law requires. *See* Wis. Stat. § 135.04; *Al Bishop Agency, Inc. v. Lithonia–Division of National Service Industries, Inc.,* 474 F.Supp. 828, 835 (E.D.Wis. 1979)(a notice containing an "unreasonable" opportunity to cure is "inadequate," meaning that any subsequent termination violates the WFDL). MuscleTech, for its part, argues that Super Natural was not a "dealer" and therefore is not entitled to the protections of the WFDL. MuscleTech does not argue that it offered Super Natural a reasonable opportunity to cure.

■ MuscleTech's primary argument on the merits is that it and Super Natural did not share a "community of interest," which is a statutory requirement for any proper "dealership." *See* Wis. Stat. § 135.02(3). Business relationships other than "dealerships" are not protected by the WFDL. *See, e.g., Frieburg Farm Equip., Inc. v.*

*Van Dale, Inc.,* 978 F.2d 395, 398 (7th Cir.1992). In *Ziegler Company, Inc. v. Rexnord, Inc.,* 139 Wis.2d 593, 604–605, 407 N.W.2d 873 (1987), the Wisconsin Supreme Court stated that courts should be led by two "guideposts" when determining whether a "community of interest" exists: "continuing financial interest," and "interdependence." These guideposts require a plaintiff "to demonstrate a stake in the relationship large enough to make the grantor's power to terminate, cancel or not renew a threat to the economic health" of the plaintiff. *Id.* at 605, 407 N.W.2d 873.

■ The court identified ten "facets" to the guideposts that should be considered when determining if a community of interest has, indeed, been demonstrated: 1) how long the parties have dealt with each other; 2) the extent and nature of the obligations imposed on the parties in the contract of agreement between them; 3) what percentage of time or revenue the alleged dealer devotes to the alleged grantor's products or services; 4) what percentage of the gross proceeds or profits the alleged dealer derives from the alleged grantor's products or services; 5) the extent and nature of the alleged grantor's grant of territory to the alleged dealer; 6) the extent and nature of the alleged dealer's uses of the alleged grantor's proprietary marks (such as trademarks or logos); 7) the extent and nature of the alleged dealer's financial investment in inventory, facilities, and good will of the alleged dealership; 8) the personnel which the alleged dealer devotes the alleged dealership; 9) how much the alleged dealer spends on advertising or promotional expenditures for the alleged grantor's products or services; and 10) the extent and nature of any supplementary services provided by the alleged dealer to consumers of the alleged grantor's products or services. *See id.* at 606, 407 N.W.2d 873. The court has warned that none of these factors is dispositive, nor is the list exclusive. The Seventh Circuit Court of Appeals has suggested that it may be more useful to focus

one's attentions on whether a) the revocation of the dealership would pose a threat to the company's economic health (read by some courts to mean "economic viability"), or b) the revocation would result in a loss of considerable "sunk costs." *See Frieburg*, 978 F.2d at 399.

Looking to the first indicator suggested by the Seventh Circuit, the court notes that if year 2000 sales figures remain constant in 2001 (which may not be a safe assumption considering Super Natural's spectacular recent sales increases in many of its lines, including MuscleTech, but the parties have not offered the court any other numbers), Super Natural's revenues will decrease 13% this year if the injunction is denied and MuscleTech is permitted to stop supplying the company with product. Super Natural contends that the figure is actually 20%, since 20% of its year 2000 revenues were derived from "Muscle-Tech" product.[7] This argument is flawed, however, since Super Natural did not obtain all of that product from MuscleTech itself—it only obtained product constituting 13% of its revenues from the manufacturer. It obtained the rest from M Olympus, and possibly from a Rhode Island outfit named Athleten Gold. As Ms. Calvy has testified that distributors are free to obtain products from other distributors and that she, herself, has sold MuscleTech product to a distributor named Palko who was unable to buy directly from Muscle-Tech, the only product properly to be considered by the court is the product that would be affected by the grant or denial of an injunction—that supplied by Muscle-Tech itself.

It goes without saying that 13% of one's revenues is not an insignificant amount, *cf. Frieburg*, 978 F.2d at 400 (11% of revenues derived from a defendant's product may be indicative of a community of interest if other indicia of a dealership are present), but other courts have found even greater revenue figures *not* indicative of such a community, *see Sales & Marketing Assocs., Inc. v. Huffy Corp.*, 57 F.3d 602, 606–607 (7th Cir.1995)(finding no community of interest despite 23% revenue figure); *Cabinetree, Inc. v. Kraftmaid Cabinetry*, 914 F.Supp. 296, 300 (E.D.Wis. 1996)(no community of interest despite 18% revenue figure); *C.L. Thompson Co. v. Festo Corp.*, 708 F.Supp. 221, 226 (E.D.Wis.1989)(no community of interest despite 15% revenue figure). While the courts in those cases considered other factors, as well (as noted below), they are indicative of the fact Super Natural faces an uphill battle proving that its economic health would be threatened by loss of the MuscleTech distributorship. This is especially so here, where Super Natural survived twelve of its sixteen years without MuscleTech and has seen its sales increase more than 100% almost across the board in the past two years.

Finding Super Natural *less* than likely to succeed on the merits of its dealership claim based on economic harm alone, the court must consider the next factor identified by the Seventh Circuit—sunk costs. Super Natural points to its new warehouse as one such sunk cost. In that manner, the argument is very like the failed argument made by the plaintiff in *Beloit Beverage Co. v. Winterbrook Corp.*, 900 F.Supp. 1097 (E.D.Wis.1995). In that case, Beloit Beverage dedicated significant space in two of its warehouses to LaCroix mineral water, yet the court refused to find a community of interest, noting that the warehouses could be sold or dedicated to other product lines. Super Natural next points to its trade show booth as a sunk cost. This cost is analogous to the display models the court found to be discretionary investments *not* indicative of a community

---

7. Actually, it is unclear from the financial records what percentage of "revenues" can be dedicated to any one brand since the court has only been supplied with detailed records regarding *purchases* made by Super Natural.

Super Natural contends that it uses a standard mark-up for most of its products and that therefore sales revenues correspond closely to purchases.

of interest in *Cabinetree, Inc. v. Kraftmaid Cabinetry,* 914 F.Supp. 296 (E.D.Wis. 1996). Even if the court were to consider the investment in the booth non-discretionary, it would find the $40,000 investment something less than significant for a company doing more than $20 million in sales each year, and easily converted to use in representing the many other products sold by Super Natural (a use to which it is already dedicated, as Super Natural represents numerous lines of products from its booth at trade shows, including Twin Labs, Sportpharma, Champion, Worldwide Sports Nutrition, Cytodyne, Labrada, Ultimate Nutrition, Nature's Way, AST, and Futurebiotics).

■ The court, then, finds Super Natural less than likely to succeed on the merits of proving potential loss of sunk investments. As such, under the *Frieburg* test, the plaintiff is less than likely to show a "community of interest." The additional "facets" identified by the Wisconsin Supreme Court in *Ziegler* do not alter this opinion. After all, the parties have dealt with each other without a contract, and only for four years (facet 1); MuscleTech did not grant Super Natural an exclusive sales territory, nor forbid it to sell the products of its competitors (facets 2 and 5); Super Natural has provided no credible evidence that it dedicated significantly greater time or revenue to the promotion of MuscleTech's products than it did to those of its competitors (facet 3); Super Natural obtained less than 15% of its gross proceeds from sales of product from MuscleTech (facet 4); Super Natural did not use MuscleTech's proprietary marks on its own buildings or materials (that is, aside from materials intended to promote MuscleTech and the other products offered by Super Natural)(facet 6); Super Natural has made no investments specific to MuscleTech (facet 7); none of Super Natural's employees is dedicated exclusively to promoting MuscleTech's products (facet 8);

Super Natural has made few expenditures in advertising MuscleTech (facet 9);[8] and Super Natural provides few, if any, supplementary services to its MuscleTech customers (facet 10).

While certain obligations placed on Super Natural by MuscleTech (particularly the $100,000 monthly purchase minimum) may provide Super Natural with *some* chance of success on the merits in proving the existence of a "dealership" protected by the WFDL, the court finds that this chance is significantly less than 50%. Indeed, it is the court's preliminary opinion that Super Natural was nothing more than a MuscleTech "vendee," albeit a very successful one. That Super Natural's relationship with MuscleTech was not a special or a vital one is shown by the fact Super Natural was willing to purchase MuscleTech-branded product from sources other than MuscleTech itself. MuscleTech was just another vendor to Super Natural, however big.

Having found that Super Natural is less than likely to succeed on the merits in showing that it shared a community of interest with MuscleTech, the court need not consider MuscleTech's arguments that Super Natural is not protected by the WFDL because it is not "situated in" Wisconsin, that MuscleTech had "good cause" to terminate Super Natural, that Super Natural has "dirty hands," that any injunction entered by this court must by necessity be closely circumscribed by the dormant commerce clause, or that the WFDL has been superseded in this case by the Lanham Act, although some of those arguments, too, may have provided the court with a basis for denying Super Natural's request for injunctive relief. Similarly, the court need not consider the public interest for or against the entry of a preliminary injunction.

---

**8.** Super Natural can point to only two MuscleTech-specific promotions, which are discussed in footnote 5.

## CONCLUSION

As the court believes the balance of harms to be roughly equal in this case, Super Natural is required to show that it is "more likely than not to win" on the merits before the court may enter a preliminary injunction in its favor. Super Natural has failed to carry this burden.

Accordingly,

**IT IS ORDERED** that Super Natural's motion for a preliminary injunction be and the same is hereby **DENIED**.